CJ-2020-3075
Timmons



*104708686868*

**IN THE DISTRICT COURT OF OKLAHOMA COUNTY**
**STATE OF OKLAHOMA**

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

JUL - 2 2020

RICK WARREN
COURT CLERK
34_____

| | |
|---|---|
| BILLY D. "RUSTY" RHOADES III, an individual; | ) |
| MEGAN L. SIMPSON, an individual; and | ) |
| MICHAEL S. HARRELL, an individual; | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| vs. | ) |
| | ) |
| THE STATE OF OKLAHOMA ex rel GOVERNOR | ) |
| KEVIN STITT; | ) |
| THE STATE OF OKLAHOMA ex rel THE | ) |
| OKLAHOMA DEPARTMENT OF PUBLIC SAFETY; | ) |
| KEVIN STITT, an individual; | ) |
| CHIP KEATING, an individual; | ) |
| JASON NELSON, an individual; and | ) |
| JOE CLARO, an individual, | ) |
| | ) |
| **Defendants.** | ) |

Case No.: **CJ 2020-3075**

**ATTORNEY LIEN CLAIMED**
**JURY TRIAL DEMANDED**

## PETITION

COME NOW the Plaintiffs, Billy D. "Rusty" Rhoades, Megan Simpson, and Michael Harrell,

and for their causes of action, hereby state and offer the following:

### JURISDICTION AND VENUE

1.      At all pertinent times, Plaintiff Billy D. "Rusty" Rhoades III was, and is currently, a

resident of Oklahoma County, State of Oklahoma.

2.      At all pertinent times, Plaintiff Megan L. Simpson was, and is currently, a resident

of Garfield County, State of Oklahoma.

3.      At all pertinent times, Plaintiff Michael S. Harrell was, and is currently, a resident

of Sequoyah County, State of Oklahoma.

4.      Defendant State of Oklahoma ex rel The Department of Public Safety is a State

Agency located and operating in Oklahoma County, State of Oklahoma.

5.     Defendant State of Oklahoma ex rel Governor Kevin Stitt is the Office of the Chief Executive Officer of the State of Oklahoma, located and operating in Oklahoma County, State of Oklahoma.

6.     Defendant Kevin Stitt, an individual, currently resides in Oklahoma County, State of Oklahoma.

7.     Defendant Chip Keating, an individual, currently resides in Oklahoma County, State of Oklahoma.

8.     Defendant Jason Nelson, an individual, currently resides in Oklahoma County, State of Oklahoma.

9.     Defendant Joe Claro, and individual, currently resides in Oklahoma County, State of Oklahoma.

10.    All or substantial parts of the actions or omissions giving rise to this action occurred in the geographical boundaries of Oklahoma County, State of Oklahoma, and therefore this court has jurisdiction over these matters and is the proper venue for this action.

11.    Plaintiffs' actions are presented pursuant to 42 U.S.C. §1983, and the Due Process Clause of the Fourteenth Amendment, and therefore this court has subject matter jurisdiction over the claims presented herein.

12.    Plaintiffs also present actions pursuant to the Oklahoma Governmental Tort Claims Act, 51 O.S. §151, et seq., and therefore this court has subject matter jurisdiction over the claims presented herein.

2

## ALLEGATIONS OF FACTS

### A. OKLAHOMA DEPARTMENT OF PUBLIC SAFETY AND REAL ID

13.     The Oklahoma Department of Public Safety is a State Agency, organized under 47 O.S. §2-101, et seq.

14.     Under Oklahoma Statutes, Title 47, Section 2-102(A)(1), the Department of Public Safety "shall be under the control of an executive officer to be known as the 'Commissioner of Public Safety', who shall be appointed by the Governor with the advice and consent of the Senate. See 47 O.S. §2-102.

15.     Under Oklahoma Statutes, Title 47, Section 2-104, the Commissioner of DPS is the sole officer responsible for the appointment of the Chief of Administration for DPS and "such other deputies, subordinates, officers, investigators and other employees as may be necessary to implement the provisions of [Title 47]." See 47 O.S. §2-104.

16.     Under Oklahoma Statues, Title 47, Section 2-105, the Commissioner of Public Safety alone shall have authority to appoint the Chief of the Oklahoma Highway Patrol. See 47 O.S. §2-105.

17.     There is no statutory authority or role for the Secretary of Public Safety, or any cabinet officer, in hiring, firing, or oversight of the Commissioner of Public Safety and/or the Chief of the Oklahoma Highway Patrol.

18.     There is no statutory authority or role for the Governor of the State of Oklahoma, in appointing, hiring, or termination of the Chief of the Oklahoma Highway Patrol under 47 O.S. §2-105.

3

19.     Under Oklahoma Statutes, Title 47, Section 2-108, the Commissioner of DPS is vested with the power and charged with the duty of "observing, administering, and enforcing the provisions of this title and of all laws regulating the operation of vehicles or the use of the highways, the enforcement and administration of which are vested in the Department of Public Safety, and the Commissioner may appoint any employee of the Department to serve as the personal representative of the Commissioner for the purpose of fulfilling any such duty." See 47 O.S. §2-108.

20.     Under Oklahoma Statutes, Title 47, Section 2-108, the Commissioner of DPS is authorized by the State of Oklahoma to adopt and enforce such rules as may be necessary to carry out the provisions of Title 47 of the Oklahoma Statutes associated with the operations of the Department of Public Safety and its mission.

21.     Under Oklahoma Statutes, Title 47, Section 2-117, the Commissioner of Public Safety and each officer of DPS, as designated and commissioned by the Commissioner, have the "powers and authority...and the right and power to investigate and prevent crime and enforce the criminal laws of the State of Oklahoma." See 47 O.S. §2-117.

22.     Under Oklahoma Statutes, Title 47, Section 2-117, the officers of DPS have the authority, responsibilities, powers, and duties that include, but are not limited to the following:

> 1) To enforce the laws regulating use of highways;
>
> 2) To enforce inspection of motor vehicles or trailers traveling on the highways;
>
> 3) To enforce the laws of the state relating to registration and licensing of vehicles;
>
> 4) To enforce the laws relating to the operation and use of vehicles on highways;
>
> 5) To enforce and prevent the violation of laws relating to size, weight, and speed of commercial motor vehicles and all laws designed for the protection of the

4

highway pavements and structures on such highways;

6) To investigate and report to the Corporation Commission and the Oklahoma Tax Commission violation of their rules and the laws governing the Transportation companies;

7) To investigate incidents involving an employee of the Department, when such incidents are related to the performance of the duties of the employee

See 47 O.S. §2-117(B).

23.    In 2005, thirteen years prior to the election of Governor Stitt, the Federal government of the United States passed the Real ID Act of 2005, which established new security standards for state-issued IDs for limited federal purposes.

24.    Since 2005, the State of Oklahoma has not met the requirements set forth under the Real ID Act of 2005, including failures under two prior governors, Governor Brad Henry and Governor Mary Fallin.

25.    At the time Plaintiffs entered into their position with DPS, and at the time Kevin Stitt became Governor of the State of Oklahoma, efforts to bring Oklahoma into compliance with Real ID Act requirements were ongoing and on track.

**B. THE PARTIES**

26.    On November 10, 2017, Governor Mary Fallin appointed Plaintiff Rhoades to the position of Commissioner of the Department of Public Safety, and Plaintiff Rhoades was subsequently approved by the Senate of the State of Oklahoma.

27.    Upon taking office, Plaintiff Rhoades, acting as Commissioner of the Department of Public Safety, selected and appointed Plaintiff Harrell into the position of Chief of Patrol of the Oklahoma Highway Patrol on or about December 1, 2017.

28.     As Commissioner of the Oklahoma Department of Public Safety, Plaintiff Rhoades selected and appointed Plaintiff Simpson into the position of General Counsel for DPS on July 23, 2018. He then promoted her into the position of Assistant Commissioner of DPS/Chief of Administration, while she remained General Counsel, on February 4, 2019.

29.     In 2018, Defendant Stitt was a candidate for Governor of the State of Oklahoma, and he was elected into that position on November 6, 2018, but did not take office until January 14, 2019.

30.     Upon his election as Governor of Oklahoma, Defendant Stitt selected and appointed Chip Keating as the Secretary of Public Safety, a volunteer position without legislative authority to take any employment action in regard to any state employee.

31.     Prior to the time Plaintiff Simpson became General Counsel for DPS, Defendant Claro was Acting Deputy General Counsel, and was later an attorney employed within the DPS Legal Department assigned to work on the Civil Asset Forfeiture Program.

32.     At all pertinent times Defendant Jason Nelson was the Deputy Cabinet Secretary for Public Safety.

### C.  EXPOSURE OF THE CIVIL ASSET FORFEITURE PROGRAM

33.     On August 8, 2018, Plaintiff Simpson met with Myriah Downs, Assistant General Counsel for DPS.

34.     Prior to August 8, 2018, Plaintiff Simpson met with Doug Young, the Director of Driver Compliance and Acting General Counsel (at the time) of DPS and Defendant Claro, who at the time was the Senior Attorney and Acting Deputy General Counsel, and neither had mentioned any issue or problem with the civil asset forfeiture program.

6

35.     During her August 8, 2018 meeting with Downs, Plaintiff Simpson inquired about Downs' interest in the position of DPS Legal asset forfeiture attorney.

36.     In response to Plaintiff Simpson's inquiry, Downs informed her of significant ethical and legal issues that Downs had observed in association with the civil asset forfeiture program.

37.     In addition, Downs informed Plaintiff Simpson that she had written a memorandum detailing and reporting on the legal and ethical issues associated with the civil asset forfeiture program and told Plaintiff Simpson she produced the memorandum to Young and Defendant Claro, and that neither had advanced her concerns.

38.     Downs further informed Plaintiff Simpson that both Young and Defendant Claro explicitly told Downs and Christa Alderman, Assistant General Counsel, to continue litigating civil asset forfeiture cases despite serious legal deficiencies that violated the constitutional rights of citizens of the United States and the State of Oklahoma to due process in the deprivation of their property by a state actor under the Fifth and Fourteenth Amendments to the Constitution of the United States and the Oklahoma Constitution, as well as potential liability under 42 U.S.C. §1983, the Oklahoma Constitution, and the Oklahoma Governmental Tort Claims Act.

39.     In addition, Downs reported to Plaintiff Simpson that both Young and Defendant Claro affirmatively blocked efforts to advance concerns about the legal and ethical problems associated with the civil asset forfeiture program.

40.     In response to Downs' reports to Plaintiff Simpson, Simpson instructed Downs to meet with Alderman and update the original memorandum to include the names of every person they had told about the legal and ethical issues, as well as any information since the original

7

memorandum was created, and to submit a copy of the updated memorandum to Plaintiff Simpson.

41.     Upon learning of Downs' report and memorandum, Plaintiff Simpson had serious concerns that DPS and the State of Oklahoma was potentially exposed to and liable for damages to citizens for violation of their rights under the law.

42.     On the same day and following her meeting with Downs, Plaintiff Simpson spoke with Christa Alderman, an attorney for DPS, and without prompting from Simpson, Alderman confirmed Downs' report.

43.     At the time she spoke to Plaintiff Simpson, Alderman's chain of command required her to report directly to Defendant Claro, and in fact she was the only attorney who did report directly to Defendant Claro. Because of this chain of command, Alderman was concerned that Defendant Claro would retaliate against her for reporting his failure to respond to, and perhaps hide, complaints about the legality and ethical violations associated with the civil asset forfeiture program and the report made by Downs. Simpson assured Alderman that she would be protected from retaliation by Claro, consistent with the public policy of the State of Oklahoma to protect against retaliation, if she was reporting accurate information.

44.     On August 9, 2018, Downs and Alderman submitted the memorandum detailing legal and ethical issues in the civil asset forfeiture program to Plaintiff Simpson.

45.     The memorandum produced to Plaintiff Simpson detailed a meeting held on May 17, 2018, in which Downs reported that there had been failure to effectuate proper service in the *majority* of asset forfeiture cases filed by DPS. Plaintiff Simpson confirmed later that DPS was in possession of only nine (9) return receipts confirming proper service. Despite this

circumstance, no action had been taken to remedy the rights of citizens or to report DPS' potentially significant exposure to liability under state and federal law.

46.     The Downs-Alderman memorandum also indicated that following the May 17, 2018, meeting, Downs and Alderman began preparing appropriate pleadings to correct the deficiencies in the civil asset forfeiture files, but Defendant Claro ordered them both to *cease all work on the asset forfeiture files*.

47.     In addition, the Downs-Alderman memorandum reported that Alderman had expressed grave concerns regarding one asset forfeiture case on June 12, 2018, and was instructed not to dismiss the matter. Following such instruction, Alderman prepared another memorandum on July 3, 2018, detailing the legal and ethical issues associated with that particular case and provided copies of the memorandum again to Young and Defendant Claro on July 3, 2018. Alderman was again ordered not to dismiss the case and to continue to proceed with seeking the civil asset forfeiture.

48.     In response to the Downs-Alderman memorandum and the revelations about the actions of Young and Defendant Claro, Plaintiff Simpson began an audit of the civil asset forfeiture cases within her office, the DPS Legal Division.

49.     Plaintiff Simpson's audit revealed significant oversight of the civil asset forfeiture cases by both Young and Claro, as well as disturbing violations of citizens' rights and mishandling of civil asset forfeiture cases that exposed DPS to significant liability.

50.     In addition to other cases, Simpson identified one case that began in 2004, in which DPS and the District Attorney of Canadian County declined any action, but had not returned nearly $18,000 to its rightful owner *for nearly fourteen years*.

9

51.     On October 29, 2018, Plaintiff Simpson submitted a memorandum to Plaintiff Rhoades, in which she detailed her discovery and corresponding audit of the issues raised in the Downs-Alderman memo, and recommended the termination of Young and Claro.

52.     In response to the October 29, 2018, memorandum, Plaintiff Rhoades instructed Troop Z to investigate the issues raised within the civil asset forfeiture program by the Downs-Alderman memorandum.

53.     The investigation revealed not only wrongdoing by Young and Defendant Claro, but it also revealed that the Asset Forfeiture Coordinator, Stephanie Ware, was involved in embezzlement of seized funds, for which she was ultimately charged and convicted in Oklahoma County.

54.     Advancement of the information regarding the unlawful and unethical actions within the civil asset forfeiture program, and the resulting investigation into the reports of Downs and Alderman threatened a source of income for law enforcement and for the State of Oklahoma by hindering the ability of DPS to collect and/or maintain seized money or assets.

55.     On information and belief, Plaintiffs assert that following their termination, civilly forfeited asset funds were used to supplement and/or pay for State of Oklahoma compliance with the requirements of the REAL ID Act, which would not have happened if Plaintiffs' efforts to rectify the rights of citizens and return unlawfully/unethically seized funds to the proper owners had continued.

### D.  BLACKMAIL BY TROY GERMAN AND SUBSEQUENT INVESTIGATION

56.     In August and September 2018, prior to the election of Defendant Stitt as Governor of the State of Oklahoma, Captain Troy German of OHP attempted to blackmail Plaintiff Rhoades in an attempt to be promoted.

57.     As part of his effort to blackmail Plaintiff Rhoades, Captain German asserted on multiple occasions, directly to Plaintiff Rhoades, that he would reveal falsified assertions of tampering with the OHP promotional process, including allegations that Plaintiff Harrell had shared test questions with Brian Orr, an OHP trooper being considered for promotion and who spent years as the primary on-field and game day bodyguard for University of Oklahoma football coach Bob Stoops, giving him some level of recognition among the general population.

58.     German made the blackmail threats to Plaintiff Rhoades on August 21, 2018, in Rhodes' office, again on September 11, 2018, at Charleston's restaurant in North Oklahoma City, and again on September 28, 2018, at Starbuck's located near Tinker Air Force Base.

59.     On September 28, 2018, at a meeting at Starbuck's, German for the third time told Plaintiff Rhoades that German had allegedly "damaging information," and that he wanted Plaintiff Rhoades to help him get promoted.

60.     At the Starbuck's meeting, German physically produced a piece of paper to Plaintiff Rhoades, upon which he listed a number of directives that he demanded Plaintiff Rhoades perform.

61.     As part of his blackmail demands, German wanted Plaintiff Rhoades to promote two new majors, and to open the positions, schedule and hold testing, and complete the promotions of German and at least one other associate or colleague of German. Plaintiff Rhoades

told German in response that he was not going to create two positions that OHP did not have available, or need, and returned the note to German.

62.    On November 13, 2018, Plaintiff Rhoades reported the blackmail attempt to Plaintiff Simpson.

63.    On the same date, Plaintiff Simpson began an inquiry into the report, by interviewing Plaintiff Rhoades, interviewing Brian Orr, interviewing Plaintiff Harrell, and providing electronic information to Matt Gottschalk of Troop Z, for purposes of opening an investigation.

64.    On November 20, 2018, Troop Z formally began an investigation into the blackmail allegation against German. Plaintiff Rhoades instructed Captain Jason Holt of Troop Z to report directly to Simpson regarding the investigation, as she was General Counsel. As General Counsel, Plaintiff Simpson instructed Captain Jason Holt of Troop Z to not reveal any information about the investigation to Rhoades or Harrell to protect the integrity of the investigation, and to investigate not only the blackmail allegation, but any indication of wrongdoing on the part of any person within OHP or DPS, related to the promotional process, to include German, Orr, Plaintiff Rhoades, and Plaintiff Harrell. As part of his charge, he was instructed to, and given freedom to, investigate any lead of wrongdoing or criminal activity to its conclusion, as an effort to identify and discipline any corrupt element within the OHP.

65.    Troop Z of the Oklahoma Highway Patrol is the internal criminal investigation unit of OHP and DPS, and it opened its criminal investigation pursuant to 47 O.S. §2-117.

66.    As a feature of Troop Z's investigation into the allegations of blackmail by Trooper German against Plaintiff Rhoades, Troop Z did exclude Plaintiffs Rhoades and Harrell from any

12

involvement or oversight of the investigation in order to ensure a thorough, fair investigation, free of influence by administrators over OHP or DPS.

67. On or about December 17, 2018, Trooper Troy German met with Trooper Michael Wallace of Troop Z as part of the Troop Z investigation. During that interview, German *admitted* that on multiple occasions he met with Plaintiff Rhoades, submitted a list of demands to Plaintiff Rhoades, and threatened to contact "the Oklahoma State Bureau of Investigation (OSBI), the OHP Command Staff, the House and Senate of Oklahoma, the media, and anyone who could 'help effect change'" if Rhoades did not meet his demands and do so on a timeline that German demanded.

68. On or about December 17, 2018, prior to meeting with Trooper Wallace, German called his supervising officer, Major Jack McCoy, who informed German that he had called German to the DPS campus that day to serve German with a notice that he was being placed on administrative leave with pay, pending the investigation.

69. After speaking with McCoy, German traveled from the DPS campus in his assigned OHP unit to the home of Captain Tim Tipton. There, German asked Captain Tipton to keep and hide German's personal cell phone before German returned to the DPS campus to be interviewed by Trooper Wallace.

70. On December 17, 2018, Captain Tim Tipton of OHP did keep and hide German's personal cell phone in what is believed an effort to hide evidence and interfere with an investigation into the actions of Troy German by Troop Z.

71. Based upon Troop Z tracking of German's OHP unit to the home of Captain Tim Tipton, Troop Z obtained a search warrant to search Tipton's home to search for German's phone.

13

72.    Prior to executing the warrant, Captain Holt of Troop Z advised Tipton that a warrant was forthcoming and he should come to DPS campus voluntarily and bring the phone, which he did.

73.    The same day, Captain Holt interviewed Tipton about his involvement in the effort to blackmail commissioner Rhoades and interfere with the OHP promotional process.

74.    During the interview of Tipton, Captain Holt gained additional information about further criminal and administrative violations, and Captain Tipton was also placed on administrative leave because of that information and his efforts to interfere with the investigation by hiding German's personal phone.

75.    In addition, as a result of the Troop Z investigation, Trooper Holt reported to Plaintiff Simpson that Major Jack McCoy as well as Captain Tim Tipton were involved in activities that violated OHP/DPS policies, and that they were associated with Captain German's efforts to blackmail Plaintiff Rhoades. As a result of this report, McCoy and Tipton were placed on administrative leave pending further investigation into their activities.

76.    On January 18, 2019, Defendant Stitt ordered an independent investigation of the Troop Z investigation, which began a second investigation by the Office of the Oklahoma Attorney General.

77.    The Attorney General's investigation resulted in a grand jury proceeding into the actions of Troy German.

78.    On February 15, 2019, as a result of the Troop Z investigation and grand jury probe, the grand jury returned an indictment against Captain German, ultimately charging him with one count of blackmail.

14

79.     On or about the same date Captain German was indicted, the Oklahoma Attorney General's Office asked DPS/OHP administrators to place any further administrative actions on hold during the pendency of the German criminal matter, with which DPS/OHP administrators complied.

80.     On June 28, 2019, the Attorney General's Office dismissed the blackmail case against German, despite his *admission* he attempted to blackmail Plaintiff Rhoades, and the matter was dismissed without the request of or approval by any of the Plaintiffs, who served as the head of the agency and the OHP.

81.     At the time the Attorney General's Office dismissed the criminal case against German, the Plaintiffs resumed their review of the Troop Z investigation and further investigation of the additional matters discovered which involved both Major Jack McCoy and Captain Tim Tipton, as well as other individuals involved in violations of law and policy. This investigation included members of the patrol in command staff of the OHP.

### E. EXPOSURE OF CORRUPTION WITHIN OHP AND DPS

82.     Following his election to the position of Governor, Defendant Stitt selected Defendant Keating to be the Secretary of Public Safety, a volunteer advisory position that has no statutory authority.

83.     In January 2019, Defendant Stitt re-appointed Plaintiff Rhodes into the position of Commissioner of DPS, but withheld the appointment from Senate confirmation proceedings pending external review of the Troop Z investigation.

84.     On February 15, 2019, a grand jury indicted Troy German for a single count of blackmail. This matter was filed in Oklahoma County District Court, Case No.: CF-2019-713.

85.     Upon completion of the grand jury probe, and after the grand jury indicted Captain German, Defendant Stitt announced the re-appointment of Plaintiff Rhoades into the position of Commissioner of DPS, on or about February 22, 2019.

86.     The re-appointment of Plaintiff Rhoades into the position of Commissioner of DPS on or about February 22, 2019, indicates that as of that date, Defendant Stitt did not have concerns related to the leadership of the agency, any delays with REAL ID, or any of the Plaintiffs working in the positions they held at the time.

87.     As of February 22, 2019, Defendant Stitt, or anyone from his office or staff, did not at any time, express any concerns to any of the Plaintiffs about the leadership of DPS or OHP, or of any concerns he had associated with management of efforts to comply with the REAL ID Act.

88.     At the time Defendant Stitt reappointed Plaintiff Rhoades, Defendant Stitt stated "I chose Commissioner Rhoades for his passion and commitment to the safety and protection of the people of Oklahoma. His years of experience with the Oklahoma Highway Patrol and the Department of Public Safety allow him to be a strong and effective leader."

89.     On March 6, 2019, the criminal charges against Captain Troy German were refiled under Oklahoma District Court Case No.: CF-2019-967.

90.     On or about June 21, 2019, Plaintiff Rhoades was in Atoka, Oklahoma at a Regional Field Meeting and Fish Fry. While there, he was called by Defendant Keating, who informed Rhoades he had just met with Oklahoma City Attorney Gary James and the General Counsel for the Governor regarding the Troy German matter. He then demanded to meet with Plaintiff Simpson and go through the ongoing investigative file, which he had no authority to do.

91.     Seven days later, on June 28, 2019, without request of or approval by Plaintiffs, including the victim of the blackmail attempt, Plaintiff Rhoades, as the administration of OHP and DPS, the criminal charges against Captain Troy German were dismissed, and prosecutors represented to the court that the dismissal was "at the request of the State."

92.     At no time did Plaintiff Rhoades, or Plaintiffs Simpson or Harrell, ever express to any prosecutor, or any officer or staff member of the Oklahoma Attorney General's Office or the Governor's Office that they no longer desired to prosecute the criminal charges against Captain Troy German.

93.     On or about June 28, 2019, the Oklahoma Attorney General's Office released a statement to the media in which it indicated that charges had been dismissed against Captain Troy German "at the request of the Oklahoma Highway Patrol," and that "the OHP determined that [dismissal of charges against German] was in the best interests of the agency."

94.     Plaintiffs deny OHP or DPS ever requested dismissal of charges against Captain German, and that the statement issued by the Attorney General's Office suggesting otherwise was not accurate or vetted with DPS/OHP administration.

95.     As noted above, following the dismissal of charges against Captain German, and the conclusion of the criminal matter against him, Plaintiff Simpson instructed Trooper Holt to continue his investigation into other violations of policy and/or law that had been identified in the Troop Z investigation that began with the report of blackmail by Captain German.

96.     Thereafter, on August 17, 2019, Defendant Keating emailed employees and officials of DPS and demanded, without any authority to do so, that Plaintiffs cease their activities required by Oklahoma law, and take no further action in support of their statutory duties under

Oklahoma law, commanding them to immediately stop *any investigation into corruption and unlawful behavior* by Troopers inside the Oklahoma Highway Patrol. See 47 O.S. §2-117.

97.     There is no provision in the statutes of Oklahoma or any policy or procedure that allows a cabinet secretary, or any person without authority, to intervene in, or access any, investigation of a Trooper, the Oklahoma Highway Patrol, or any function of Troop Z, the investigative arm of the Department of Public Safety.

98.     Eleven days after the email from Defendant Keating, on Wednesday, August 28, 2019, Plaintiff Simpson terminated Joe Claro as Deputy General Counsel of DPS, in part due to his involvement in mismanagement and/or covering up mismanagement of the civil asset forfeiture program, described above.

99.     On Thursday, August 29, 2019, during a meeting with DPS Human Resources Representative Stephanie Dodd, Defendant Claro made the comments "I'll be back," "What goes around comes around," and "There are other unapproved terminations the governor doesn't know about." Claro made these comments in the presence of OHP Trooper Michael Patnode.

100.    The next day, August 30, 2019, for the first time, Defendant Keating accused Plaintiffs and DPS of not meeting benchmarks for REAL ID.

101.    Plaintiffs assert that this concern over any alleged failure to meet the benchmarks for REAL ID is pretextual for the actual unlawful reasons for their termination which happened three days later, on a federal and state holiday so as to avoid media scrutiny and opportunity for Plaintiffs to respond to the allegations.

102.    Plaintiffs assert that upon his termination on August 28, 2019, Defendant Claro immediately advanced false reports to Defendant Keating and/or Defendant Stitt, whether

directly or through intermediaries, including Defendant Nelson, to suggest the REAL ID program was not meeting its benchmarks, and that Defendants were also motivated in the termination of Plaintiffs by the desire to interfere with and/or end investigations into the Oklahoma Highway Patrol that were advanced by Plaintiffs and ongoing by Troop Z, consistent with 47 O.S. §2-117.

## F. TERMINATION OF PLAINTIFFS

103.    On September 2, 2019, Deputy Cabinet Secretary for Public Safety Jason Nelson contacted Defendants Rhoades, Simpson, and Harrell by telephone and immediately told them the telephone call was being recorded.

104.    During the September 2, 2019 phone calls from Defendant Nelson, he informed each Plaintiff that their credentials to both enter any DPS facility and to access the DPS computer system had already been terminated prior to these calls.

105.    The indication that Plaintiffs' credentials had been terminated indicates Plaintiffs had already been involuntarily terminated prior to the September 2, 2019 telephone call from Defendant Nelson.

106.    During his telephone call to the Plaintiffs, Defendant Nelson informed Plaintiffs Rhoades and Harrell that they would no longer be employed by DPS and/or the State of Oklahoma. Nelson informed Plaintiff Simpson that she had a choice to resign or be terminated, and if no decision was made by 5pm, she would be terminated.

107.    At approximately 5pm on September 2, 2019, Jason Nelson sent a text message to Defendant Simpson and informed her that she had been terminated.

108.   At no time were Plaintiffs given any opportunity to remain employed with the agency and any decision to end their employment was forced by Defendants in violation of their rights.

109.   Within ten days of the Plaintiffs' termination, Major Jack McCoy and Captain Tim Tipton were returned to full duty with the OHP.

110.   Plaintiffs' termination was motivated in substantial part by their efforts to comply with their statutory duties and police power under the statutes governing the DPS and their efforts to expose corruption by people associated with the OHP and/or DPS under those statutes, as well as the criminal laws of the State of Oklahoma.

111.   As noted above, none of the Defendants, including Defendant Stitt, have any authority to terminate or replace the Chief of the Oklahoma Highway Patrol or the Chief of Administration or other deputies to the Commissioner. See Oklahoma Statutes, Title 47, Sections 104 and 105.

112.   Such terminations motivated by the Plaintiffs' actions in conformity with the statutes of the State of Oklahoma, and their efforts to eliminate corruption within OHP/DPS, are in violation of the public policy of the State of Oklahoma.

113.   Such terminations, enforced by parties without authority to do so are in violation of the public policy of the State of Oklahoma.

114.   Under Oklahoma Statutes, Title 47, Section 2-102 (D), "Any employee of the Department of Public Safety appointed to the position of Commissioner shall have the ability to return to the previous position of the employee without any loss of rights, privileges or benefits immediately upon completion of the duties as Commissioner, provided the employee is not

otherwise disqualified due to disciplinary reasons, termination of employment or inability to effectively lead the agency."

115. At the time Plaintiff Rhoades was removed from his position, he was not allowed any option to return to his prior position, as required under 47 O.S. §2-102(D).

116. Plaintiff Rhoades was not provided any notice or opportunity to respond prior to being foreclosed from returning to his prior position as required under 47 O.S. §2-102(D).

117. Under Oklahoma Statutes, Title 47, Section 2-105(A)(1), "A Chief of the Oklahoma Highway Patrol Division...shall have a right of return to the highest classified commissioned position within the Highway Patrol Division of the Department of Public Safety without any loss of rights, privileges or benefits immediately upon completion of the duties in the unclassified commissioned position."

118. At the time Plaintiff Harrell was removed from his position he was not allowed any option to return to his prior position, as required under 47 O.S. §2-105(A)(1).

119. Plaintiff Harrell was not provided any notice or opportunity to respond prior to being foreclosed from returning to his prior position as required under 47 O.S. §2-105(A)(1).

## G. OKLAHOMA GOVERNMENTAL TORT CLAIMS ACT NOTICE REQUIREMENT

120. On or about October 7, 2019, the Plaintiffs submitted Governmental Tort Claims Notices in regard to their claims in compliance with the Oklahoma Governmental Tort Claims Act, 51 O.S. §151, et seq.

121. On January 5, 2020, by operation of law, the Plaintiffs' Tort Claims were denied following ninety days after receipt of the Tort Claims by the State of Oklahoma.

122.    This action is filed within 180 days of the denial of the Plaintiffs' Tort Claims, and therefore the Plaintiffs' tort claims are timely presented herein.

## CAUSES OF ACTION

### I. FIRST CAUSE OF ACTION – 42 U.S.C. §1983 (DUE PROCESS)

Plaintiffs adopt and incorporate paragraphs 1-122 above, as if fully set forth herein, and in further support of their First Cause of Action offer the following:

123.    The First Cause of Action is on behalf of Plaintiff Rhoades only, and is presented against Defendants Stitt, Keating, Claro, and Nelson in their individual capacity.

124.    At all times described above, Defendants acted under color of state law.

125.    Plaintiff Rhoades had a property interest in continued employment as set forth under 47 O.S. §2-102, which conferred upon him a right against deprivation of such interest without due process under the Fifth and Fourteenth Amendments to the United States Constitution.

126.    Defendants' actions in depriving Plaintiff Rhoades of his expectation of continued employment, and subsequent continued employment, were in violation of Plaintiff's due process rights under the Fifth and Fourteenth Amendments to the United States Constitution.

127.    Defendants' actions described herein are the actual and proximate cause of damages suffered by Plaintiff Rhoades, to which he is entitled to recover.

128.    Plaintiff Rhoades is entitled to recover actual damages, including but not limited to lost wages, future lost wages, lost benefits, future lost benefits, retirement and pension benefits, and any other actual damage he can prove.

129.    Plaintiff Rhoades is entitled to recover compensatory damages for emotional distress and loss of his reputation, due to the actions of the Defendants.

130.    In addition, the actions of the Defendants were reckless or callously indifferent to the rights of the Plaintiff, and/or motivated by an evil intent, and Plaintiff Rhoades is therefore entitled to recover punitive damages.

131.    Plaintiff Rhoades seeks damages pursuant to this cause of action in excess of the amount required for diversity jurisdiction pursuant to Section 1332 of Title 28 of the United States Code.

132.    Plaintiff Rhoades is entitled to a reasonable attorney fee pursuant to 42 U.S.C. §1988, should he prevail on his cause of action.

## II. SECOND CAUSE OF ACTION – OKLAHOMA CONSTITUTION, ARTICLE II, SECTION VII (DUE PROCESS)

Plaintiffs adopt and incorporate paragraphs 1-132 above, as if fully set forth herein, and in further support of their Second Cause of Action offer the following:

133.    The Second Cause of Action is on behalf of Plaintiff Rhoades only, and is presented against Defendants Stitt, Keating, Claro, and Nelson in their individual capacity.

134.    At all times described above, Defendants acted under color of state law.

135.    Plaintiff Rhoades had a property interest in continued employment as set forth under 47 O.S. §2-102, which conferred upon him a right against deprivation of such interest without due process under Article II, Section VII of the Oklahoma Constitution.

136.    Defendants' actions in depriving Plaintiff Rhoades of his expectation of continued employment, and subsequent continued employment, were in violation of Plaintiff's due process rights under Article II, Section VII of the Oklahoma Constitution.

23

137.    Defendants' actions described herein are the actual and proximate cause of damages suffered by Plaintiff Rhoades, to which he is entitled to recover.

138.    Plaintiff Rhoades is entitled to recover actual damages, including but not limited to lost wages, future lost wages, lost benefits, future lost benefits, retirement and pension benefits, and any other actual damage he can prove.

139.    Plaintiff Rhoades is entitled to recover compensatory damages for emotional distress and loss of his reputation, due to the actions of the Defendants.

140.    In addition, the actions of the Defendants were reckless or callously indifferent to the rights of the Plaintiff, and/or motivated by an evil intent, and Plaintiff Rhoades is therefore entitled to recover punitive damages.

141.    Plaintiff Rhoades seeks damages pursuant to this cause of action in excess of the amount required for diversity jurisdiction pursuant to Section 1332 of Title 28 of the United States Code.

### III. THIRD CAUSE OF ACTION – 42 U.S.C. §1983 (DUE PROCESS)

Plaintiffs adopt and incorporate paragraphs 1-141 above, as if fully set forth herein, and in further support of their Third Cause of Action offer the following:

142.    The Third Cause of Action is on behalf of Plaintiff Harrell only, and is presented against Defendants Stitt, Keating, Claro, and Nelson in their individual capacity.

143.    At all times described above, Defendants acted under color of state law.

144.    Plaintiff Harrell had a property interest in continued employment as set forth under 47 O.S. §2-105, which conferred upon him a right against deprivation of such interest

without due process under the Fifth and Fourteenth Amendments to the United States Constitution.

145.     Defendants' actions in depriving Plaintiff Harrell of his expectation of continued employment, and subsequent continued employment, were in violation of Plaintiff's due process rights under the Fifth and Fourteenth Amendments to the United States Constitution.

146.     Defendants' actions described herein are the actual and proximate cause of damages suffered by Plaintiff Harrell, to which he is entitled to recover.

147.     Plaintiff Harrell is entitled to recover actual damages, including but not limited to lost wages, future lost wages, lost benefits, future lost benefits, retirement and pension benefits, and any other actual damage he can prove.

148.     Plaintiff Harrell is entitled to recover compensatory damages for emotional distress and loss of his reputation, due to the actions of the Defendants.

149.     In addition, the actions of the Defendants were reckless or callously indifferent to the rights of the Plaintiff, and/or motivated by an evil intent, and Plaintiff Harrell is therefore entitled to recover punitive damages.

150.     Plaintiff Harrell seeks damages pursuant to this cause of action in excess of the amount required for diversity jurisdiction pursuant to Section 1332 of Title 28 of the United States Code.

151.     Plaintiff Harrell is entitled to a reasonable attorney fee pursuant to 42 U.S.C. §1988, should he prevail on his cause of action.

## IV. FOURTH CAUSE OF ACTION – OKLAHOMA CONSTITUTION, ARTICLE II, SECTION VII
### (DUE PROCESS)

Plaintiffs adopt and incorporate paragraphs 1-151 above, as if fully set forth herein, and in further support of their Fourth Cause of Action offer the following:

152.    The Fourth Cause of Action is on behalf of Plaintiff Harrell only, and is presented against all Defendants in their individual capacity.

153.    At all times described above, Defendants acted under color of state law.

154.    Plaintiff Harrell had a property interest in continued employment as set forth under 47 O.S. §2-105, which conferred upon him a right against deprivation of such interest without due process under Article II, Section VII of the Oklahoma Constitution.

155.    Defendants' actions in depriving Plaintiff Harrell of his expectation of continued employment, and subsequent continued employment, were in violation of Plaintiff's due process rights under Article II, Section VII of the Oklahoma Constitution.

156.    Defendants' actions described herein are the actual and proximate cause of damages suffered by Plaintiff Harrell, to which he is entitled to recover.

157.    Plaintiff Harrell is entitled to recover actual damages, including but not limited to lost wages, future lost wages, lost benefits, future lost benefits, retirement and pension benefits, and any other actual damage he can prove.

158.    Plaintiff Harrell is entitled to recover compensatory damages for emotional distress and loss of his reputation, due to the actions of the Defendants.

159.    In addition, the actions of the Defendants were reckless or callously indifferent to the rights of the Plaintiff, and/or motivated by an evil intent, and Plaintiff Harrell is therefore entitled to recover punitive damages.

160. Plaintiff Harrell seeks damages pursuant to this cause of action in excess of the amount required for diversity jurisdiction pursuant to Section 1332 of Title 28 of the United States Code.

## V. FIFTH CAUSE OF ACTION – 51 O.S. §151, et seq. – GTCA
### (Wrongful Termination)

Plaintiffs adopt and incorporate paragraphs 1-160 above, as if fully set forth herein, and in further support of their Fifth Cause of Action offer the following:

161. The Fifth Cause of Action is on behalf of all Plaintiffs and is presented against the State of Oklahoma ex rel the Office of the Governor of the State of Oklahoma and Kevin Stitt in his capacity as Governor of Oklahoma.

162. The terminations and/or forced discharge of Plaintiffs was in violation of Oklahoma public policy, specifically in retaliation for Plaintiffs actions consistent with the laws of Oklahoma and Plaintiffs' efforts to effectuate the police power and required investigative and disciplinary functions of the Commissioner of the Department of Public Safety and his administrative officials as set forth under 47 O.S. §2-117 and the criminal statutes of the State of Oklahoma.

163. Defendants' actions in wrongfully terminating Plaintiffs were the actual and proximate cause of damages they suffered, to which they are entitled to recover.

164. Plaintiffs each are entitled to recover actual and compensatory damages, including but not limited to lost wages, future lost wages, lost benefits, future lost benefits, retirement and pension benefits, and any other actual and/or compensatory damages allowed under the laws of the State of Oklahoma.

27

165.    Plaintiffs seek damages pursuant to this cause of action in excess of the amount required for diversity jurisdiction pursuant to Section 1332 of Title 28 of the United States Code.

**VI. SIXTH CAUSE OF ACTION – Tortious Interference with Employment Relationship**

Plaintiffs adopt and incorporate paragraphs 1-165 above, as if fully set forth herein, and in further support of their Sixth Cause of Action offer the following:

166.    The Sixth Cause of Action is on behalf of all Plaintiffs and is presented against Defendants Keating, Nelson, and Claro, in their individual capacity.

167.    Defendants Keating, Nelson, and Claro have, and at no time had, any authority within the course and scope of their employment to interfere with the employment of Plaintiffs and had an affirmative duty not to do so.

168.    The actions of the Defendants Keating, Nelson, and Claro, constitute an intentional interference with the employment relationship of the Plaintiffs with their employer.

169.    The actions of the Defendants Keating, Nelson, and Claro, were the actual and proximate cause of damages suffered by the Plaintiffs, which the Plaintiffs are entitled to recover.

170.    Plaintiffs each are entitled to recover actual and compensatory damages, including but not limited to lost wages, future lost wages, lost benefits, future lost benefits, retirement and pension benefits, and any other actual and/or compensatory damages allowed under the laws of the State of Oklahoma.

171.    Plaintiffs are entitled to recover punitive damages against Defendants Keating, Nelson, and Claro.

172.    Plaintiffs seek damages pursuant to this cause of action in excess of the amount required for diversity jurisdiction pursuant to Section 1332 of Title 28 of the United States Code.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray this honorable court enter an order in their favor, together with awards for actual damages, compensatory damages, and punitive damages as plead above, a reasonable attorney fee, and further relief available to the Plaintiffs the court deems appropriate.

RESPECTFULLY SUBMITTED THIS 2nd DAY OF JULY, 2020.


HOPSON LEGAL LLC


Dustin J. Hopson, OBA #19485
Hopson Legal LLC
512 NW 12th Street
Oklahoma City, OK 73103
Telephone: (405) 232-6357
Email: dustin@hopsonlawfirm.com
Attorney for Plaintiffs

# VERIFICATION

STATE OF OKLAHOMA )
)
COUNTY OF _OKLAHOMA_ )

I, Billy D. "Rusty" Rhoades, of lawful age, being first duly sworn on my oath, deposes and says that I have read the above and foregoing Petition, and that all of the matters and facts therein set out are true and correct, to the best of my knowledge.

Further affiant saith not.

_____
Billy D. "Rusty" Rhoades

Subscribed and sworn to before me this _1st_ day of ~~June~~ July, 2020, by Billy D. "Rusty" Rhoades.

(SEAL)

SHELLY MARTIN
NOTARY
# 11000727
EXP. 01/24/23
PUBLIC
STATE OF OKLAHOMA

_____
Notary Public

My Commission Expires:

1-24-23
_____

**VERIFICATION**

STATE OF OKLAHOMA                    )
                                     )
COUNTY OF GARFIELD                   )

    I, Megan L. Simpson, of lawful age, being first duly sworn on my oath, deposes and says that I have read the above and foregoing Petition, and that all of the matters and facts therein set out are true and correct, to the best of my knowledge.

    Further affiant saith not.

_____
Megan L. Simpson

    Subscribed and sworn to before me this 15 day of ~~June~~ July, 2020, by Megan L. Simpson.



(SEAL)

_____
Notary Public

My Commission Expires:

May 15, 2021

# VERIFICATION

**STATE OF OKLAHOMA** )

**COUNTY OF** _Sequoyah_ )

I, Michael S. Harrell, of lawful age, being first duly sworn on my oath, deposes and says that I have read the above and foregoing Petition, and that all of the matters and facts therein set out are true and correct, to the best of my knowledge.

Further affiant saith not.

_07-01-2020_

_Michael S Harrell_

Michael S. Harrell

_cf_ Subscribed and sworn to before me this _1st_ day of ~~June,~~ 2020, by Michael S. Harrell.  _eR_ _July_

(SEAL)

> CONNIE J. RIDDLE
> Notary Public
> State of Oklahoma
> Commission # 01015644

_Connie Riddle_

Notary Public

My Commission Expires:

_09-11-2021_