## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| BILLY D. "RUSTY' RHOADES III,<br>an individual;<br>MEGAN L. SIMPSON, an individual;<br>and MICHAEL S. HARRELL,<br>an individual,<br><br>       Plaintiffs,<br><br>v.<br><br><br>THE STATE OF OKLAHOMA, ex rel.<br>GOVERNOR KEVIN STITT;<br>THE STATE OF OKLAHOMA, ex rel.<br>THE DEPARTMENT OF PUBLIC<br>SAFETY;<br>KEVIN STITT, an individual;<br>CHIP KEATING, an individual;<br>JASON NELSON, an individual; and<br>JOE CLARO, an individual,<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   No.  CIV-20-761-R<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>ORDER</u>

Before the Court is Defendants' Second Partial Motion to Dismiss, Doc. No. 21.

Plaintiffs responded in opposition to the Motion, Doc. No. 22, and Defendants then filed a

Reply, Doc. No. 23. The Court finds as follows.

According to the Complaint, Oklahoma Governor Mary Fallin appointed Plaintiff

Billy D. Rusty Rhoades III ("Rhoades") as the Commissioner of the Department of Public

Safety ("the Department") on November 10, 2017. Doc. No. 16, ¶ 26. Soon thereafter,

Rhoades selected Plaintiff Michael S. Harrell ("Harrell") as the Chief of Patrol of the

Oklahoma Highway Patrol in December of 2017 and Plaintiff Megan Simpson ("Simpson") as the General Counsel for the Department in July of 2018. *Id.* ¶¶ 27–28.

In August of 2018, Simpson met with various other members of the Department's legal team. First, she met with Defendant Joe Claro ("Claro"), Senior Attorney and Acting Deputy General Counsel, and Doug Young, Acting General Counsel. *Id.* ¶ 34. Next, Simpson met with Myriah Downs ("Downs"), Assistant General Counsel, to inquire about "Downs' interest in the position of [the Department's] Legal asset forfeiture attorney." *Id.* ¶ 35. Downs then informed Simpson that the asset forfeiture program suffered from legal and ethical issues—including "serious legal deficiencies that violated … constitutional rights"—which Downs had documented in a memorandum and produced to Young and Claro. *Id.* ¶¶ 36–38.

Allegedly, Downs further informed Simpson that "both Young and [ ] Claro explicitly told [her] […] to continue litigating civil asset forfeiture cases despite" the serious deficiencies, and both Young and Claro "blocked efforts to advance concerns" about the issues in the asset forfeiture division Downs had documented. *Id.* ¶¶ 38-39. Simpson discovered that the asset forfeiture division "fail[ed] to effectuate proper service in the *majority* of asset forfeiture cases filed by DPS." *Id.* ¶ 45. In October of 2018, Simpson submitted the issues to Rhoades, who in turn instructed "Troop Z"—the investigative arm of the Department—to investigate the asset forfeiture division. *Id.* ¶ 52.

The Complaint states that the investigation revealed wrongdoing by Young, Claro, and asset forfeiture coordinator Stephanie Ware, who was eventually charged and convicted for embezzlement based on conduct within the asset forfeiture division. *Id.* ¶ 53.

Meanwhile, in August and September of 2018, Rhoades alleges that Oklahoma Highway Patrol Captain Troy German ("German") "attempted to blackmail Rhoades in an attempt to be promoted." Doc. No. 16, ¶ 56. The blackmail demands sought promotion of German, "two new majors," and at "least one other associate or colleague of German." *Id.* ¶¶ 56, 61. The alleged compromising material German threatened to reveal included "reveal[ing] falsified assertions of tampering with the OHP promotional process." *Id.* ¶ 57. Subsequently, Rhoades reported the blackmail attempt to Simpson, who in turn provided electronic information to "Troop Z, for purposes of opening an investigation." *Id.* ¶ 63. Troop Z then began an internal investigation into the blackmail on November 20, 2018. *Id.* ¶ 64. Next, Defendant Kevin Stitt ("Stitt")—who was inaugurated as the Governor of Oklahoma on January 14, 2019—ordered an independent investigation of the Troop Z investigation on January 18, 2019. *Id.* ¶ 76.

On February 15, 2019, "as a result of the Troop Z investigation," German was charged by a grand jury with one count of blackmail. *Id.* ¶ 78. The Complaint describes the Plaintiff's efforts to investigate the asset forfeiture division and the attempted blackmail as the "Exposure of Corruption within [the Department and the Oklahoma Highway Patrol]." *Id.* ¶¶ 82–102.

After his inauguration in January, on February 22, 2019, Stitt announced "the re-appointment of [ ] Rhoades" as Commissioner of the Department. *Id.* ¶ 86. Not long after, in June of 2019, Defendant Chip Keating ("Keating")—Secretary of Public Safety—"demanded to meet with [ ] Simpson and go through the ongoing investigative file, which he had no authority to do." *Id.* ¶ 90. Just one week later, on June 28, 2019, the criminal

charges against German were dismissed "at the request of the state" and because the Oklahoma Highway Patrol "determined that [dismissal] was in the best interests of the agency." *Id.* ¶¶ 91, 93.

Nonetheless, Simpson instructed the Troop Z investigations, beginning with the report of German's blackmail, to continue. *Id.* ¶ 95. Then, on August 17, 2019, Keating demanded that the Plaintiffs cease investigations and "take no further actions in support of their statutory duties under Oklahoma law…". *Id.* ¶ 96.

On August 28, 2019, Simpson terminated Claro from his post as Deputy General Counsel partially due to his "involvement in mismanagement and/or covering up mismanagement of the [ ] asset forfeiture program…". *Id.* ¶ 98.  The following day, during a meeting with the Department's Human Resources Division, Claro stated "I'll be back," "What goes around comes around," and "There are other unapproved terminations the governor doesn't know about." *Id.* ¶ 99. The Plaintiffs allege that immediately after his termination, Claro "advanced false reports to Defendant Keating and/or Defendant Stitt, whether directly or through intermediaries…". *Id.* ¶ 102.

"The next day, August 30, 2019, for the first time, [ ]  Keating accused Plaintiffs and [the Department] of not meeting benchmarks for REAL ID"—a program enacted in 2005 which "established new security standards for state-issued IDs for limited federal purposes." *Id.* ¶¶ 23, 100. On September 2, 2019, the Plaintiffs were terminated from their positions in the Department. *Id.* ¶¶ 103–07. The Plaintiffs allege the terminations were the product of "Claro's false reports to Defendants Nelson[,] Keating, and/or Stitt" and were

made alongside pretextual statements that the Plaintiffs had not complied with the REAL ID Act. *Id.* ¶¶ 109, 112.

On September 3, 2019 and September 8, 2019, "The Daily Oklahoman reported and published" the terminations of the Plaintiffs and the statements of Defendant Stitt, "accusing Plaintiffs of failure to meet requirements of the REAL ID act, which were knowingly false…". *Id.* ¶¶ 116–17.

In response, on July 2, 2020, Plaintiffs filed an action in state court in Oklahoma County, alleging due process violations under the federal and state constitutions, wrongful termination, and tortious interference with employment. Doc. No. 1–2. Defendants then removed the action to this Court on August 4, 2020. Doc. No. 1. At the Court's direction, Plaintiffs amended their complaint. Doc. No. 16. Plaintiffs' Amended Complaint included an additional claim for a violation of due process against Stitt for alleged statements to the press. *Id.* Defendants now move to dismiss i) Rhoades's due process claim arising from his termination, ii) Rhoades and Harrell's due process claims under the Oklahoma Constitution, iii) Plaintiffs' wrongful termination claims, iv) Plaintiffs' tortious interference claim, and v) Rhoades's due process claims against Stitt for his statements to the media. Doc. No. 21.

In considering a Motion to Dismiss under Rule 12(b)(6), the Court must determine whether a plaintiff has stated a claim upon which relief may be granted. The motion is properly granted when the Complaint provides no "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action*." Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Complaint must contain enough "facts to state a claim to

relief that is plausible on its face," *id.* at 570, and the factual allegations "must be enough to raise a right to relief above the speculative level." *Id.* at 555 (citations omitted). The Court must accept all the well-pleaded allegations of the Complaint as true and must construe the allegations in the light most favorable to Plaintiff. *Id.*; *Alvarado v. KOB–TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007). But the Court need not accept as true those allegations that are conclusory in nature. *Erikson v. Pawnee Cnty. Bd. of Cnty. Comm'rs*, 263 F.3d 1151, 1154–55 (10th Cir. 2001). "[C]onclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based." *Hall v. Bellmon*, 935 F.2d 1106, 1109–10 (10th Cir. 1991).

## I.       § 1983 Due Process Claim (Count 1)

"[T]o prevail on either a procedural or substantive due process claim [under § 1983], a plaintiff must first establish that a defendant's actions deprived plaintiff of a protectible property interest." *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210 (10th Cir. 2000). The Constitution does not establish a property interest itself, rather, one is "created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract." *Teigen v. Renfrow,* 511 F.3d 1072, 1079 (10th Cir. 2007) (internal citations and quotation marks omitted). The question for public employees is whether state law provides "'a legitimate claim of entitlement' in continued employment, as opposed to a 'unilateral expectation' or 'an abstract need or desire' for it." *Farthing v. City of Shawnee, Kan.,* 39 F.3d 1131, 1135 (10th Cir. 1994) (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). A legitimate claim of entitlement could be grounded in "state statutes, local ordinances, established rules, or mutually explicit

understandings." *Id.* (citing *Dickeson v. Quarberg*, 844 F.2d 1435, 1437 (10th Cir. 1988)); *see also Calhoun v. Gaines,* 982 F.2d 1470, 1474 (10th Cir. 1992) (explaining that state law governs whether a sufficient property exists in one's employment).

Defendants advance three arguments that Plaintiffs' due process claims should be dismissed. First, Defendants reason that the Governor's removal of Rhoades is not subject to judicial review under *Bynum v. Strain*, 218 P. 883 (Okla. 1923). Alternatively, Defendants argue that Okla. Stat. tit. 47, § 2-102 does not supply Rhoades with a property interest and that even if it did, each Defendant is entitled to qualified immunity.[1] Rhoades responds by arguing that the Governor does not have the authority to remove the Commissioner except for cause, and that Okla. Stat. tit. 47 § 2-102 supplied Rhoades with an expectation of continued employment. Doc. No. 22, pp. 15-16.

In Oklahoma, when the Governor holds clear statutory authority to appoint and remove executive officials, the judiciary may not review the Governor's removal decision. *Bynum*, 218 P. at 889. *But see Wentz v. Thomas*, 15 P.2d 65, 87 (Okla. 1932) (explaining that the Governor's general removal power may be limited by express statutory provisions proscribing a different specific removal process). In *Bynum*, the Oklahoma Supreme Court explained that "in the absence of express authority, the judiciary has nothing to do with the [Governor's] judgment, conscience, sense of duty, or responsibilities." *Bynum*, 218 P. at 889. In *Bynum,* the state legislature had formally authorized the Governor to appoint—and to remove for cause—the bank commissioner "by legislative act." *Id.* at 886. In other

---

[1] The Court need not address the qualified immunity arguments because the Governor's termination of a purely executive officer is not subject to review. Further, because the termination is not subject to review, Rhoades did not have a protected property interest in his employment.

words, by statute, the Governor held the authority to choose the bank commissioner and to decide when to terminate him. After the Governor attempted to remove him from office, the acting bank commissioner sought to enjoin the Governor from terminating him. *Id.* at 884. The relevant statute in *Bynum* explained that the "Bank Commissioner [...] shall be subject to removal by the Governor for cause…". 218 P. at 887. The Oklahoma Supreme Court held that the commissioner failed to state a cause of action, reasoning that based on the statute's express language, the bank commissioner is an executively appointed position solely accountable to the Governor. *Id.* at 889. Accordingly, the Court explained that because the bank commissioner was solely subordinate to the Governor, it was beyond the judiciary's authority to question his removal. *Id.*

The Oklahoma Supreme Court has since articulated two relevant exceptions to the Governor's general removal authority. First, the Governor's statutory removal authority may be limited by other specific statutory limitations. *See, e.g.*, *Wentz*, 15 P.2d at 87. In *Wentz*, the Oklahoma Supreme Court explained that the Legislature's adoption of a specific statute—providing that a State Highway Commission member be removed "from office *only by any court of competent jurisdiction* for [ ] neglect of duty, corruption in office, [etc.]"—validly restricted the Governor's removal power and granted the judiciary the authority to review the termination. *Id.* at 70 (emphasis added). The court reasoned that when the Governor's appointment and removal authority is based in statute, such authority may also be limited by a more specific statute. *Id.* at 87 (Riley, J., specially concurring).

Second, the deference granted to the Governor in *Bynum* does not apply when an independent state agency "is primarily a quasi-legislative and quasi-judicial administrative

body." *Hall v. Tirey*, 501 P.2d 496, 501 (Okla. 1972). In *Hall*, the Oklahoma Supreme Court explained that the court in *Bynum* relied on "the *executive* nature of the principal duties of the bank commissioner," while the State Board for Property and Casualty Rates was an independent agency exercising quasi-legislative and quasi-judicial functions. *Id.* at 500–01 (emphasis in original). Therefore, because the Board's function was not solely executive, the court was not precluded from reviewing the Governor's decision to terminate the state board member. *Id.* at 502. In *Hall*, the Oklahoma Supreme Court incorporated the reasoning of *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), which examined how courts should evaluate whether an administrative agency is purely executive or is quasi-legislative or quasi-judicial. *Id.*

An officer's position is purely executive when the position's duty is restricted to "the performance of executive functions" and is without any duty to "either the legislative or judicial power." *Humphrey's Ex'r v. United States*, 295 U.S. 602, 627–28 (1935) (citing *Myers v. United States*, 272 U.S. 52 (1926)). The executive branch is charged with "tak[ing] care that [the laws] be faithfully executed." *Myers v. United States*, 272 U.S. 52, 117 (1926); *see also* Okla. Const. art. VI, § 8 ("The Governor shall cause the laws of the State to be faithfully executed…"). On the other hand, an agency is quasi-legislative or quasi-judicial when it is "created by Congress to carry into effect legislative policies embodied in the statute in accordance with the legislative standard therein prescribed, and to perform other specified duties as a legislative or as a judicial aid." *Humphrey's Ex'r*, 295 U.S. at 628 ("Such a body cannot in any proper sense be characterized as an arm or an eye of the executive."). In determining the character of the office, courts consider the text

of the statute implementing the agency and the legislative history prior to the agency's formation. *Id.*

Neither exception to the Governor's general removal authority in Okla. Stat. tit. 74 § 2 applies to Rhoades's claim because there is no specific statute limiting the Governor's appointment and removal authority and because the Commissioner of Public Safety is primarily executive.

First, Rhoades repeatedly asserts that he "could not be removed by the Governor except upon reasons, or [for] cause, set forth in 74 O.S. § 2." Doc. No. 22, p. 13. However, the statute in *Bynum* similarly expressed that the "Bank Commissioner [...] shall be subject to removal by the Governor for cause…". 218 P. at 887. In *Bynum*, the Oklahoma Supreme Court explained that based on the language of the statute describing the *Governor's* authority to remove for cause, "the judiciary is without jurisdiction to direct the Governor in the management of executive affairs and powerless to enforce its mandates, should it assume to do so." *Id.* at 888. Here, Okla. Stat. tit. 74 § 2 also states that "[t]he *Governor* shall have the power to remove any officers appointed by him, in case of incompetency, neglect of duty, or malfeasance in office." (emphasis added). This general removal statute has been interpreted to provide the Governor "exclusive and final authority for determining whether sufficient cause exists to warrant removal of an officer" when the position is purely executive. *Hall*, 501 P.2d at 501.

Second, the Commissioner of Public Safety of the State of Oklahoma is clearly an "executive" role. In Okla. Stat. tit. 47 § 2-102(a)(1), the state legislature explained that "[t]he Department shall be under the control of an *executive* officer to be known as the

"Commissioner of Public Safety", who shall be appointed by the Governor with the advice and consent of the Senate." (emphasis added). Similar to the bank commissioner in *Bynum*, Rhoades reported to the Governor and performed a purely executive role. *Bynum*, 501 P.2d at 500–501. The Commissioner of Public Safety is required to "be a professional law enforcement officer with ten (10) years' experience in the field of law enforcement or with five (5) years' experience in the field of law enforcement . . . ." Okla. Stat. tit. 47, § 2-102(a)(2). The role of commissioner is clearly to enforce, or execute, on behalf of the executive branch. Accordingly, Rhoades' position is purely executive, and not quasi-legislative or quasi-judicial.

In conclusion, under the Governor's general removal power, Okla. Stat. tit. 74 § 2, terminations of appointed individuals in primarily executive functions are not subject to judicial review absent a specific statutory limitation. Because the Commissioner of Public Safety is clearly a primarily executive function and no specific limitation applies, Stitt's termination of Rhoades is not subject to judicial review.

Therefore, Rhoades's § 1983 claim is hereby DISMISSED.

## II.     State Constitutional Claims (Counts 2 & 4)

Rhoades and Harrell allege that Stitt, Nelson, Keating, and Claro violated their state constitutional rights under Okla. Const. art. II, § 7. Doc. No. 16, p. 25.  Defendants argue that there is no private right of action supporting Rhoades's and Harrell's allegations.

Though the Oklahoma Supreme Court recognized a private right of action against a governmental entity in *Bosh v. Cherokee Cnty. Bldg. Auth.*, 305 P.3d 994, 1001 (Okla. 2013), the court has since made it clear that *Bosh* is not a "wide ranging authorization of

private rights of action for all claims arguably arising under the Oklahoma Constitution." *See, e.g.*, *Earles v. Cleveland*, 418 F. Supp. 3d 879, 891 (W.D. Okla. 2019). Furthermore, "*Bosh's* rationale is limited to those circumstances where a plaintiff has 'no other avenue' for recovering his or her claimed constitutional injuries." *Bruning v. City of Guthrie, Okla.*, No. CIV-15-0003-HE, 2015 WL 4925995, at *8 (W.D. Okla. Aug. 18, 2015) (citing *Perry v. City of Norman*, 341 P.3d 689, 692–93 (Okla. 2014)).

As to Harrell, a due process claim under *Bosh* is unavailable because Harrell may pursue a due process claim under § 1983. As discussed above, the Oklahoma Supreme Court has "previously declined to create a new tort cause of action for an alleged constitutional violation where an alternative remedy existed to vindicate the alleged wrong." *Barrios*, 432 P.3d at 239 n.21 (citing *Perry*, 341 P.3d at 692–93). In Oklahoma, the "same due process protections guaranteed by the 14th amendment [to the United States Constitution] are also guaranteed by Art. 2, § 2" of the Oklahoma Constitution. *McCormick v. Halliburton Co.*, 895 F. Supp. 2d 1152, 1157 (W.D. Okla. 2012) (quoting *E. Okla. Bldg. & Constr. Trades Council v. Pitts,* 82 P.3d 1008, 1012 (Okla. 2003)). Because § 1983 provides an alternative remedy, Harrell has an avenue for relief outside of *Bosh* for his alleged constitutional violation. *See, e.g.*, *Earles*, 418 F. Supp. 3d at 891 (explaining that § 1983 provided another avenue "for recovering [plaintiff's] claimed constitutional injuries"). Accordingly, Harrell's state constitutional claim is subject to dismissal.

Section 1983 does not provide an alternative remedy for Rhoades because, unlike Harrell's, his termination is not subject to review.[2] Nonetheless, Rhoades is not without a remedy. To the extent he alleges the "individual Defendants participated in corruption and/or fraud, and/or acted in bad faith in an effort to conceal criminal activity…", Doc. No. 22, p. 19, such allegations may be pursued against the individual Defendants as tort claims against government actors for conduct outside the scope of their employment. *See, e.g*, *Earles*, 418 F. Supp. 3d at 891 ("Plaintiff is not precluded from bringing *tort* claims […] for conduct outside the scope of their employment.") (emphasis added). Accordingly, neither Rhoades nor Harrell is without an alternative remedy for the alleged state constitutional violations, *see Barrios*, 432 P.3d at 239 n.21, and therefore, *Bosh* is inapplicable and the state constitutional claims are hereby DISMISSED.

### III.   Wrongful Termination Claims (Count 5)

Next, Plaintiffs bring claims of wrongful termination against the State of Oklahoma *ex rel* the Office of the Governor and Governor Stitt in his official capacity. Doc. No. 16 ¶¶ 173–77. Traditionally, in Oklahoma, "an employment contract of indefinite duration [could] be terminated without cause at any time without incurring liability...". *Burk v., K-Mart Corp.,* 770 P.2d 24, 26 (Okla. 1989); *see also Hinson v. Cameron*, 742 P.2d 549, 552 n.6 (Okla. 1987) ("Oklahoma jurisprudence recognizes the so-called at-will employment

---

[2] Rhoades's state constitutional claim is still subject to dismissal for the same reason that his § 1983 claim is subject to dismissal—his termination is not subject to judicial review. As discussed above, "the same due process protections guaranteed [in the federal Constitution] are also guaranteed [by the Oklahoma Constitution]." *McCormick*, 895 F. Supp. 2d at 1157. Accordingly, as discussed in the analysis of Rhoades's § 1983 claim, the Governor's termination of Rhoades is not subject to judicial review under the due process clause. *See Bynum*, 218 P. at 889. Though this removes his due process remedy, he may still pursue his claim through traditional tort claims.

doctrine."). Yet, in *Burk*, the Supreme Court of Oklahoma explained that "[a]n employer's termination of an at-will employee in contravention of a clear mandate of public policy is a tortious breach of contractual obligations." 770 P.2d at 28. This cause of action, referred to as a *Burk* tort, is available when "an employee is discharged for refusing to act in violation of an established and well-defined public policy or for performing an act consistent with a clear and compelling public policy." *Wilburn v. Mid-S. Health Dev., Inc.*, 343 F.3d 1274, 1277 (10th Cir. 2003) (quoting *Burk*, 770 P.2d at 29).

Each Plaintiff argues that the Complaint states a sufficient *Burk* tort claim. Doc. No. 16, ¶ 173. To state a claim under *Burk*, the Plaintiff

> must allege (1) an actual or constructive discharge (2) of an at-will employee (3) in significant part for a reason that violates an Oklahoma public policy goal (4) that is found in Oklahoma's constitutional, statutory, or decisional law or in a federal constitutional provision that prescribes a norm of conduct for Oklahoma and (5) no statutory remedy exists that is adequate to protect the Oklahoma policy goal.

*Vasek v. Bd. of Cty. Comm'rs of Noble Cnty.*, 186 P.3d 928, 932 (Okla. 2008) (citing *McCrady v. Okla. Dept. of Pub. Safety*, 122 P.3d 473, 475 (Okla. 2005)).

The parties dispute whether an adequate remedy exists to protect the policy goal that Plaintiffs allege Defendants violated. Defendants argue that the Oklahoma Whistleblower Act provides an adequate remedy. Doc. No. 21, p. 23. Plaintiffs respond that the allegations in the Complaint describe activity that is not "covered by or protected by the Whistleblower Act, and therefore there is no adequate remedy to protect the public policy goals set forth in Okla. Stat. tit. 47 § 2–117." Doc. No. 22, pp. 19-20.

"The [Oklahoma] Legislature has determined that this state's sovereign interest is better served by the remedies and penalties in the Whistleblower Act [ ] than by a suit in court." *Poff v. Oklahoma ex rel. Oklahoma Dep't of Mental Health & Substance Abuse Servs.*, No. CIV-14-1438-C, 2015 WL 1955377, at *2 (W.D. Okla. Apr. 29, 2015), *aff'd*, 683 F. App'x 691 (10th Cir. 2017). Accordingly, in the Tenth Circuit, "a *Burk* tort claim is not cognizable for claims that would be covered by the Whistleblower Act." *Poff*, 683 F. App'x 691, 695 (10th Cir. 2017) (citing *Shephard v. CompSource Okla.*, 209 P.3d 288, 292–93 (Okla. 2009)). Thus, the issue for the Court is whether the conduct in the Complaint is conduct covered by the Whistleblower Act.

When a plaintiff's allegations "fall squarely within the [text of] the Whistleblower Act," an adequate remedy exists to preclude a *Burk* tort. *Poff*, 683 F. App'x at 695 (holding that internally reporting that a state agency was not enforcing public policy was covered by the Whistleblower Act). "The purpose of the Whistleblower Act is to encourage and protect the reporting of wrongful governmental activities and to deter retaliation against state employees for reporting those activities." Okla. Stat. tit. 74 § 840-2.5(A). When explaining the type of conduct that is covered by the Whistleblower Act, it provides that

> [n]o officer or employee of any state agency shall prohibit or take disciplinary action against employees of such agency […] for
>
> […]
>
> 2. Reporting a violation of the Oklahoma Constitution, state or federal law, rule or policy; mismanagement; a gross waste of public funds; an abuse of authority; or a substantial and specific danger to public health or safety;
>
> 3. Discussing the operations and functions of the agency, […] with […] persons in a position to investigate or initiate corrective action[…].

15

Okla. Stat. tit. 74 § 840-2.5(B). The Whistleblower Act does not, however, protect "general discussions […] which do not report wrongful governmental activities…". *See Burgess v. State ex rel Oklahoma Dep't of Envtl. Quality*, 438 P.3d 829, 834 ¶ 16 (Okla. Civ. App. 2019) (explaining that the "plain, clear, unmistakable, unambiguous, and unequivocal language of § 840-2.5 clearly provides that the stated purpose of the Act is to encourage and protect the reporting of *wrongful* governmental activities…") (emphasis in original).

Plaintiffs' claims fall squarely within the text of the Whistleblower Act. First, Plaintiffs allege that Simpson interviewed several individuals about Rhoades's blackmail allegations and "provid[ed] electronic information to Matt Gottschalk of Troop Z, *for purposes of opening an investigation*." Doc. No. 16, ¶ 63 (emphasis added). When Simpson provided information to Troop Z to open an investigation, her communication amounted to "discuss[ions of] the operations and functions of the agency with persons in a position to investigate" the allegations because Troop Z is described as "the investigative arm of the Department of Public Safety." Doc. No. 16, ¶ 97; *see* § 840-2.5(B)(3). Similarly, in response to receiving the memorandum detailing issues within the civil asset forfeiture program, "Rhoades instructed Troop Z to investigate…". Doc. No. 16, ¶ 52. Thus, Rhoades also discussed "the operations and functions of the agency" with "persons in position to investigate…". § 840-2.5(B)(3).

The information provided to Troop Z undoubtedly included "wrongful governmental activities" as well. The Plaintiffs allege that the information uncovered in the civil asset forfeiture division "revealed [ ] wrongdoing by Young and Defendant

Claro"—Doc. No. 16, ¶ 53—and that Simpson provided information regarding Trooper German's attempted blackmail to Troop Z. *Id.* ¶ 67. Further, the Plaintiffs explain that their terminations resulted from "efforts to expose corruption" within the Department. *Id.* ¶ 122.

Providing underlying information of wrongful governmental conduct to the investigative arm of the Department is clearly conduct covered by the Whistleblower Act. Additionally, the Complaint states that the "Defendants were also motivated in the termination of Plaintiffs by the desire to interfere with and/or end investigations into the Oklahoma Highway Patrol that were advanced by Plaintiffs and ongoing by Troop Z…". *Id.* ¶ 102. Accordingly, Plaintiffs' *Burk* tort claims are unavailable because the Whistleblower Act provided an adequate remedy for the public policy allegedly violated by Defendants.

Therefore, Plaintiffs' wrongful termination claims are hereby DISMISSED.

## IV.    Tortious Interference Claims (Count 6)

Keating, Nelson, and Claro also seek dismissal of Plaintiffs' intentional interference with employment contract claims, arguing that the Plaintiffs failed to plead that the "[Defendants] took some action to interfere with another's employment." Doc. No. 21, p. 25. Alternatively, Keating and Nelson argue that the Complaint does not adequately allege facts indicating they acted "maliciously and wrongfully." *Id.* p. 26.

To establish tortious interference with employment, a plaintiff must show: "1) interference with a business or contractual right; 2) malicious and wrongful interference that is neither justified, privileged, nor excusable; and 3) damage proximately sustained as

17

a result of the interference." *Tuffy's, Inc. v. City of Okla. City*, 212 P.3d 1158, 1165 (Okla. 2009). In Oklahoma,

> the second element of the tort of interference with contract "requires a showing of bad faith and thus cannot be committed within the scope of employment...". Thus, if Plaintiff has plausibly alleged that any of the Individual Defendants acted in bad faith, [his] claim … may proceed.

*Vesper v. Indep. Sch. Dist. No. 89 of Oklahoma City*, No. CV-17-1165-G, 2018 WL 6070354, at *3 (W.D. Okla. Nov. 20, 2018) (internal citations omitted).

The circumstances alleged in the Complaint raise an inference that the Defendants stated a plausible claim for tortious interference with employment.

First, Plaintiff states a plausible claim against Defendant Claro. In the Complaint, the Plaintiffs allege that Claro "affirmatively blocked efforts to advance concerns about the legal and ethical problems associated with the civil asset forfeiture program." Doc. No. 16, ¶ 39. Further, despite employees' attempts to remedy the wrongs in the asset forfeiture files, "Claro ordered [the employees to] cease all work on the asset forfeiture files." *Id.* ¶ 46. Then, during a meeting with Human Resources, Claro commented "I'll be back," "What goes around comes around," and "There are other unapproved terminations the governor doesn't know about." *Id.* ¶ 99. Finally, Plaintiffs allege that "on August 28, 2019, Defendant Claro immediately advanced false reports to Defendant Keating and/or Defendant Stitt, whether directly or through intermediaries…". *Id.* ¶ 102. Taken together, the allegations against Defendant Claro raise a plausible claim for tortious interference of employment.

Next, Plaintiffs allege that Keating demanded a meeting with Simpson to "go through the ongoing investigative file, which he had no authority to do." *Id.* ¶ 90. Then, "on August 17, 2019, Defendant Keating emailed employees and officials of DPS and demanded, without any authority to do so, that Plaintiffs cease their activities required by Oklahoma law, [...] commanding them to immediately stop any investigation into corruption and unlawful behavior by Troopers inside the Oklahoma Highway Patrol." *Id.* ¶ 96. Lastly, Plaintiffs allege that "Nelson and Keating interfered with the employment of Plaintiffs by making and/or advancing false and misleading reports to Defendant Stitt following the termination of Defendant Claro [...] so that they could interfere with or prevent efforts of the agency leadership…". *Id.* ¶ 113.

Keating and Nelson argue the Complaint fails to allege "that they acted to further their own private interests, as opposed to the interests of their employer." Doc. No. 23, p. 11 (citing *Kinsey v. Cable Meat Ctr., Inc.*, No. CIV-07-0704-HE, 2007 WL 9711147, at *2 (W.D. Okla. Oct. 10, 2007)). In other words, Keating and Nelson posit that they never exceeded the scope of their employment, and thus, cannot be held liable for tortious interference. Doc. No. 21, p. 23. However, accepting the facts in the Complaint as true—as the Court must at the pleading stage, *see Twombly*, 550 U.S. at 555—alleging that Nelson and Keating "advance[ed] false and misleading reports to Defendant Stitt" is sufficient to infer that each acted in bad faith and beyond the scope of their employment at this stage. Doc. No. 16, ¶ 113. Accordingly, the allegations against Claro, Keating and Nelson are sufficient to state a claim for tortious interference with an employment contract.

Therefore, Defendants' motion to dismiss Plaintiffs' claims for tortious interference with an employment contract is hereby DENIED.

### V.   Rhoades's Due Process Claim Based on Stitt's Statements to the Media (Count 7)

Lastly, Stitt seeks dismissal of Plaintiffs' due process claims arising from Stitt's statements to the media.

"Under the Due Process Clause, public employees have a liberty interest in their reputations, but only in the context of their employment." *Coleman v. Utah State Charter Sch. Bd.*, 673 F. App'x 822, 829 (10th Cir. 2016) (citing *Paul v. Davis*, 424 U.S. 693, 701, 706 (1976); *McDonald v. Wise*, 769 F.3d 1202, 1212 (10th Cir. 2014)). In order to allege that a defendant deprived a plaintiff of a reputational interest—based on statements to the media—the plaintiff must plead that: (1) the statements impugn the good name, reputation, honor, or integrity of the employee; (2) the statements were false; (3) the statements occurred in the course of terminating the employee or foreclose other employment opportunities; and (4) the statements were published. *McDonald*, 769 F.3d at 1212. Stitt disputes only the first element—arguing that the Plaintiffs failed to "allege statements that are sufficiently "stigmatizing" that [ ] impugn [the Plaintiffs'] 'honesty or immorality (sic).'" Doc. No. 21, p. 29 (citing *Fox-Rivera v. Colorado Dept. of Public Health & Env.*, 610 F. App'x 745, 748 (10th Cir. 1992)).[3]

---

[3] Plaintiffs' response did not address whether the statements made to the press were sufficiently stigmatizing to satisfy the first element of their claim, rather, Plaintiffs responded that the "statements made were knowingly false…", and therefore, dismissal is inappropriate. Doc. No. 22, p. 31.

Statements accusing employees of "negligence, […], unsatisfactory work, or dereliction in performing [ ] duties" do not support a violation of a protected interest. *See Fox-Rivera*, 610 F. App'x at 747. Specifically, the Tenth Circuit has stated that "statements involving unsatisfactory performance are not sufficiently stigmatizing for a protected liberty interest." *Id.* at 748. In *Fox-Rivera*, the statements by the defendants allegedly impugning the plaintiff—who was responsible for laboratory blood testing—solely focused on his poor job performance. *Id.* at 746-47. Specifically, the statements included: i) that "[the plaintiff] had failed to follow test protocols"; ii) that he "had been terminated for 'unsatisfactory performance'"; and iii) that he "was the cause of and responsible for the flaw[s]" in his laboratory. *Id.* The Tenth Circuit affirmed the district court's dismissal because the statements, which only involved the plaintiff's unsatisfactory job performance, were not sufficiently stigmatizing for a protected liberty interest. *Id.* at 748.

Similarly, here, the statements allegedly supporting the Plaintiffs' due process claims solely involve unsatisfactory job performance and are therefore insufficient to state a claim. In an interview with *The Oklahoman*,[4] Stitt explained his reasoning for the terminations by stating:

---

[4] "District court[s] may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (citing *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007)). Here, in the Complaint, Plaintiffs referred to the news articles attached as exhibits to Defendants' motion to dismiss. The Complaint states that

> [o]n September 3, 2019, The Daily Oklahoman reported and published on the terminations of the Plaintiffs citing "repeated delays in coming into compliance with the federal REAL ID law," misstating the terminations as "retirements," false assertions about Plaintiff Rhoades' role in the investigation of Trooper Troy German.

"I can just see they don't have a clue of what's going on[.] There's just been no leadership whatsoever, and I'm not going to put up with it. I have to answer to Oklahomans and move the needle on that."

[…]

"[Rhoades] was our guy but I lost confidence in him on moving the needle and running that agency efficiently and effectively."

The Oklahoman Editorial Board, *Real ID Compliance Coming, Stitt Vows*, THE OKLAHOMAN (Sept. 8, 2019), https://oklahoman.com/article/5640593/real-id-compliance-coming-stitt-vows.[5] In *Fox-Rivera*, the court reasoned that statements discussing the plaintiff's failure to follow test protocols and overall unsatisfactory performance were insufficient. *Fox-Rivera*, 610 F. App'x at 746–47. Here, the statements made by Stitt are also clearly limited to job performance. Stitt stated that the Department "ha[s] no clue of what's going on," that it boasts "no leadership whatsoever," and that he "lost confidence in [Rhoades's ability] to run[ ] the agency efficiently and effectively." The Oklahoman Editorial Board, *supra* at https://oklahoman.com/article/5640593/real-id-compliance-coming-stitt-vows. Stitt's statements did not discuss Plaintiffs' "dishonesty or immorality" or any other "serious misconduct" that could underlie a valid due process claim. *See, e.g.,*

---

On September 8, 2019, The Daily Oklahoman reported and published additional statements by Defendant Stitt, accusing Plaintiffs of failure to meet requirements of the REAL ID act, which were knowingly false and misleading.

Doc. No. 16 ¶¶ 116–17.

Defendants attached exhibits of articles published by *The Oklahoman* on September 3rd and September 8th, both of which discuss the Plaintiffs' terminations. Doc. No. 21-3. Because the Plaintiffs have not disputed the authenticity of the articles and the contents of the articles are the subject of Plaintiffs' claims, *see Smith*, 561 F.3d at 1098, the Court may consider the documents at this stage.

[5] Although Plaintiffs also refer to statements made by Governor Stitt to *The Oklahoman* on September 3, 2019, there are no published "statements" made by Governor Stitt discussing Plaintiffs in the September 3rd article. *See* Nolan Clay, *Oklahoma Gov. Kevin Stitt Replaces Public Safety Commissioner*, THE OKLAHOMAN (Sept. 3, 2019), https://oklahoman.com/article/5640247/public-safety-commissioner-replaced.

*Hicks v. City of Watonga*, 942 F.2d 737, 746 (10th Cir. 1991) (explaining that allegations of poor work performance alone cannot supply a protected liberty interest). Here, the statements reveal Stitt "lost confidence in" the Plaintiffs' job performance and they were terminated accordingly. Such statements do not give rise to a due process violation.

Therefore, Plaintiffs' due process claims based on Stitt's statements to the media are hereby DISMISSED.

In conclusion, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART, as set forth herein.

**IT IS SO ORDERED** on this 8[h] day of March 2021.

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE