UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA


(1) BILLY D. "RUSTY"              )
RHOADES III, an individual;      )
(2) MEGAN L. SIMPSON,            )
an individual; and               )
(3) MICHAEL S. HARRELL,          )
an individual,                   )
                                 )
Plaintiffs,                      )
                                 )                Case No.
v.                               )             CIV-20-761-R
                                 )
(1) THE STATE OF OKLAHOMA,       )
ex rel. GOVERNOR KEVIN STITT;    )
(2) THE STATE OF OKLAHOMA,       )
ex rel. THE DEPARTMENT OF PUBLIC )
SAFETY;                          )
(3) KEVIN STITT, an individual;  )
(4) CHIP KEATING, an individual; )
(5) JASON NELSON, an individual; )
(6) JOE CLARO, an individual,    )
                                 )
        Defendants.              )



DEPOSITION OF CHIP KEATING

TAKEN ON BEHALF OF THE PLAINTIFFS

IN OKLAHOMA CITY, OKLAHOMA

ON OCTOBER 5, 2022



REPORTED BY KERRY L. HUFF, CSR #1725



**EXHIBIT 4**

Lowery & Associates
320 NW 13th Street, Oklahoma City, OK 73103
405.319.9990 - loweryandassociates@coxinet.net

Chip Keating 10/5/2022                                    6

1                         CHIP KEATING,

2        The Witness, having been first duly sworn to

3    testify the truth, the whole truth and nothing but

4    the truth, answered in reply to the questions asked,

5    as follows, to-wit:

6

7                     DIRECT EXAMINATION

8    BY MR. HOPSON:

9        Q.  Mr. Keating, good morning.

10       A.  Morning.

11       Q.  My name is Dustin Hopson.  I am the attorney

12   for Rusty Rhoades, Megan Simpson and Mike Harrell.

13   We're here to conduct your deposition today.  You

14   understand that.  Correct?

15       A.  Correct.

16       Q.  And you've given depositions in the past?

17       A.  I have.

18       Q.  And in fact you gave a deposition in the Troy

19   German matter.  I believe that was about a year ago?

20       A.  Correct.

21       Q.  The rules for the deposition are going to be

22   very similar so I'm going to kind of gloss over them

23   pretty quickly.  You're sworn in under oath and agree

24   to testify and tell the truth today.  Right?

25       A.  Correct.

1    Q.  All right.  And you're going to continue to

2  give verbal answers rather than nods of the head or

3  shakes of the head?

4    A.  Correct.

5    Q.  Because we have a court reporter she has to

6  take everything down.  You understand that?

7    A.  Yes.

8    Q.  All right.  If you need a break at any time,

9  would you just ask me, and I'll be happy to

10  accommodate you?

11    A.  Okay.

12    Q.  All right.  If I ask you a question, it's

13  important that you understand it.  If you do not

14  understand my question, will you ask me to repeat it

15  or rephrase it and I will accommodate you as to that?

16    A.  I will.

17    Q.  All right.  Would you please state your full

18  name for the record.

19    A.  Anthony Frances Keating, III.

20    Q.  And you go by Chip.  Correct?

21    A.  Yes.

22    Q.  All right.  And what is your current job

23  title?

24    A.  I'm self-employed.

25    Q.  All right.  And what is the name of your

Chip Keating 10/5/2022                                    8

 1  company?

 2      A.  Keating Investments.

 3      Q.  Is that a company you own entirely, or do you

 4  own that with others?

 5      A.  I own it entirely.

 6      Q.  What does Keating Investments do?

 7      A.  Oil and gas and real estate investing.

 8      Q.  How long have you been the owner of Keating

 9  Investments?

10      A.  Thirteen years.

11      Q.  Do you own any other companies?

12      A.  There's multiple companies under the --

13      Q.  Under the umbrella of --

14      A.  Correct.

15      Q.  -- Keating Investments?

16      A.  Yes.

17      Q.  All right.  Can you tell me the names of some

18  of those other companies?

19      A.  Let's see.  Poppy Pay, Energy 11, Energy

20  Resources 12, 111 Reality, Rock Creek Capital.

21      Q.  Do any of those companies deal with any

22  activities or contracts associated with the state of

23  Oklahoma?

24      A.  No.

25      Q.  They're all investment or holding companies?

1      A.  They're private companies.

2      Q.  I'm sorry.  Did --

3      A.  Or the two energy companies are public

4  companies.

5      Q.  Which are those two?

6      A.  Energy 11 and 12.

7      Q.  Publically traded?

8      A.  No.

9      Q.  Just publically --

10      A.  They're public non-traded vehicles.

11      Q.  Do you have any current position or role at

12  the State of Oklahoma?

13      A.  I am the chair of the Unified Law Enforcement

14  Consolidation Commission.

15      Q.  What is that commission?

16      A.  It's a statutory commission that was created

17  last legislative session to study law enforcement

18  unification within state agencies.

19      Q.  You said last session.  You mean the 2022

20  session, this year?

21      A.  '21 session.

22      Q.  The 2021 session.  All right.  Tell me about

23  law enforcement unification.  What does that entail?

24      A.  So it is a commission of, gosh, agency heads

25  of DPS, OBN, OSBI, the secretary of public safety,

1  still Senator Kim David and Representative John

2  Echols -- I think that's it -- to study unifying

3  those three agencies into one umbrella.

4      Q.  Which three agencies are we talking about?

5  DPS, OBN and OSBI?

6      A.  Correct.

7      Q.  All right.  And you said that you sit on that

8  commission.  Do you hold a -- is there -- I'm sorry.

9  Strike that.  You said you're the chair of that

10 commission?

11     A.  Correct.

12     Q.  All right.  And you said the secretary of

13 public safety, Senator Kim David, Representative John

14 Echols are also on that committee?

15     A.  Correct.  And the attorney general.  I left

16 the AG out.

17     Q.  And the attorney general.  All right.  Anyone

18 else?

19     A.  I -- I think that's right.  I don't have it in

20 front of me.

21     Q.  How long have you been the chair of that

22 committee?

23     A.  I think probably two weeks after it was

24 statutorily created.

25     Q.  Now, at some point you were the secretary of

Chip Keating 10/5/2022

1  public safety.  Correct?

2     A.  Correct.

3     Q.  What was the beginning and end date to your

4  service as secretary of public safety?

5     A.  Somewhere around March of '19 through December

6  of '20.

7     Q.  Okay.  All right.  I want to go through a

8  little bit of background before I get into your

9  service as secretary of public safety.  What is your

10  education history?  What's your -- where did you go

11  to high school?

12     A.  Bishop Mcguinness.

13     Q.  And what year did you graduate?

14     A.  1998.

15     Q.  And you attended I believe SMU; is that

16  correct?

17     A.  Correct.

18     Q.  And you graduated from SMU?

19     A.  I did.

20     Q.  What year?

21     A.  2001.

22     Q.  With what degree?

23     A.  A BBA.

24     Q.  Any other higher education degrees?

25     A.  No.

1    Q.  (By Mr. Hopson)  Okay.  And you told us you've

2   known Mike Hunter since you were 16.  How long have

3   you known Kevin Stitt?

4    A.  Since the fall of 2018.

5    Q.  And you told us that it was about two years

6   ago that you considered Mike Hunter no longer to be a

7   friend of yours in association with you working for

8   Kevin Stitt.  Right?

9       MR. SHINN:  Object to the form.

10       THE WITNESS:  I want to be clear.  Mike

11   Hunter's a family friend of my father.  I would

12   consider more of an acquaintance from being around --

13   obviously my dad's my dad.  So there was a

14   professional relationship with Mike Hunter, but it's

15   not like I'm having dinner with him nor have I ever

16   had dinner with him.  So I don't know what quantifies

17   a friendship.  I would consider him more of an

18   acquaintance.

19    Q.  (By Mr. Hopson)  Okay.  So to back up and be

20   clear and make the record clear, you never considered

21   Mike Hunter a friend.  Is that your testimony?

22    A.  I would consider him an acquaintance.

23    Q.  My question was with whether you ever

24   considered him to be a friend.

25    A.  Well, I consider a lot of people friends.  I'm

 1    A.  The Oklahoma State Troopers Foundation.

 2    Q.  When did you start the Oklahoma State Troopers

 3 Foundation?

 4    A.  Approximately 2016.  It was shortly after

 5 Lieutenant Heath Meyers was killed.  Probably the

 6 fall of '16.

 7    Q.  What is the mission or purpose of the Oklahoma

 8 State Troopers Foundation?

 9    A.  When it was started or today?

10    Q.  Fair point.  When it was started what was the

11 mission or purpose of the Oklahoma State Troopers

12 Foundation?

13    A.  To provide financial support for line-of-duty

14 deaths, incapacitating injuries and mental wellness.

15    Q.  What is the mission as it stands today?

16    A.  Really geared towards mental wellness more.

17    Q.  What is the reason that has changed over the

18 years?

19    A.  Well, I mean, you know, hopefully we don't

20 have line-of-duty deaths to deal with.

21    Q.  Certainly.

22    A.  And so the direction of the foundation -- we

23 will still assist in those if they, heaven forbid,

24 happen, but the mental wellness is a real issue that

25 needs to be addressed.  It's become a passion of

```
 1  patrol and troopers and wanting to help, you know,

 2  make things better, and that's my way of giving back.

 3     Q.  So is that still the case today, the patrol is

 4  a passion of yours?

 5     A.  Yeah.

 6     Q.  Why is that?

 7     A.  Because I was a state trooper.

 8     Q.  And you've had friends who were also state

 9  troopers?

10     A.  I still have friends.

11     Q.  And that was my next question.  You still have

12  friends who are troopers?

13     A.  Correct.

14     Q.  When you were a state Oklahoma -- I'm sorry.

15  When you were a Oklahoma Highway Patrol trooper from

16  2001 until roughly 2005 -- is that correct?

17     A.  I think the summer of '4.

18     Q.  Okay.  When you were a highway patrolman, what

19  troop were you assigned to?

20     A.  Troop B initially.

21     Q.  Okay.

22     A.  Then Troop A.

23     Q.  What was Troop B assigned to?  Was it assigned

24  to a specific area?  Was it assigned to a specific

25  duty?  Can you describe that for me?
```

1    A.   Bob's health wasn't good and Melissa wasn't

2  interested.

3    Q.   All right.  Following your meeting with Rusty

4  Rhoades and Kevin Stitt around the election of 2018,

5  when did you either become interested in or become

6  approached to become a member of the Stitt

7  administration?

8    A.   To be clear, I was never interested in that

9  job.  I was approached late January, early February,

10  2019.

11    Q.   And the job we're talking about is secretary

12  of public safety?

13    A.   Correct.

14    Q.   Cabinet position?

15    A.   Correct.

16    Q.   Cabinet position, it's a volunteer position?

17    A.   Correct.

18    Q.   Cabinet position that's a volunteer position

19  that does not have any established statutory duties

20  that you're aware of?

21    A.   Not that I'm aware of.

22    Q.   Do you consider the statutes of the state of

23  Oklahoma to be important?

24        MR. SHINN:  Object to form.

25        THE WITNESS:  It's the law.

1  you came to select him as your -- was his title the

2  deputy secretary of public safety?

3      A.  Correct.

4      Q.  How was it that you came to choose Jason

5  Nelson?

6      A.  Jason has been -- I've known Jason -- he

7  worked for my father, gosh, probably since the

8  mid '90s, and a former member of the house -- state

9  house and he helped me on my campaign when I ran for

10  the state house in 2005 unsuccessfully.

11     Q.  Who did you run against?

12     A.  David Dank.

13     Q.  What was Jason Nelson's role on your 2005

14  campaign?

15     A.  He was a volunteer.

16     Q.  Now, there's not any statutory provision

17  setting forth the position of deputy secretary of

18  public safety.  Correct?

19     A.  Correct.

20     Q.  That's a position that you created?

21         MR. SHINN:  Object to the form.

22         THE WITNESS:  The governor did.

23     Q.  (By Mr. Hopson)  Okay.  Did the governor

24  approach you and ask you to appoint a deputy, or did

25  you approach the governor and ask to appoint a

1  deputy?

2    A.  As a condition for taking the job, I told him

3  I would require having someone to help me because I

4  run a lot of businesses.

5    Q.  Okay.  So that was your requirement, not the

6  governor's.  Right?

7    A.  Correct.

8    Q.  All right.  And the governor did what you

9  asked him to do and agreed to allow somebody to hire

10  a deputy for you?

11    A.  Correct.  To help with a lot of the day-to-day

12  stuff that comes as a requirement of the cabinet

13  secretary in reviewing a lot of paperwork, signing a

14  lot of paperwork and I needed help.

15    Q.  Okay.  If -- sorry.  Is it your position that

16  the governor can assign or hire anyone he wants to

17  help you in the position of cabinet secretary?

18    A.  I mean I think the governor has -- runs the

19  executive branch of government and probably has broad

20  authority to bring people on to run services in

21  government.

22    Q.  Okay.  Is it your position or belief that the

23  governor, by virtue of being -- running the executive

24  branch of government -- is it your position that he

25  can hire or terminate anyone that works for the state

1  out of the DPS budget at least in part, isn't it true

2  that Jason Nelson was categorized as a special

3  assistant to Commissioner Rusty Rhoades in order to

4  establish that paycheck?

5      A.  I don't recall that.

6      Q.  Jason Nelson could not be a superior officer

7  to the commissioner of public safety.  Correct?

8          MR. SHINN:  Object to the form.

9          THE WITNESS:  Jason Nelson is still not a

10  superior officer to any agency head.

11     Q.  (By Mr. Hopson)  That's right.  He's never

12  been.

13     A.  No.

14     Q.  Correct?  In your role as secretary of public

15  safety, did you consider yourself to be a superior

16  officer or employee to the commissioner of DPS?

17     A.  Didn't think myself to be superior to anybody.

18     Q.  Okay.

19     A.  I served at the pleasure of the governor --

20     Q.  Okay.

21     A.  -- as his liaison.

22     Q.  Did you have authority to instruct, command,

23  discipline or otherwise supervise the commissioner of

24  DPS?

25     A.  Delegated authority from the governor.

1  governor still being governor elect.  I'm not sure.

2  It was in that timeframe.

3    Q.  So you had the trip and the communications

4  with Senator Treat?

5    A.  Correct.

6    Q.  And then sometime after that you talked to

7  Rusty Rhoades by phone or in person?

8    A.  Both.

9    Q.  And was that also in 2018 or was it in 2019?

10   A.  2018, early '19.

11   Q.  Okay.  All right.  And what is your

12 understanding of the German investigation?

13       MR. SHINN:  Object to the form.

14   Q.  (By Mr. Hopson)  Do you have any understanding

15 of the German investigation?

16   A.  No.

17   Q.  Have you ever read or reviewed the report that

18 Troop Z did about whatever it found in that

19 investigation?

20   A.  No.

21   Q.  Did you ever talk to the agent that handled

22 that investigation?

23   A.  The agent?

24   Q.  The trooper that was assigned to

25 investigate --

Chip Keating 10/5/2022                                                68

1     A.  Okay.

2     Q.  -- that matter?

3     A.  No.

4     Q.  You may have talked to that person, but did

5  you ever talk to that person about the investigation?

6     A.  Troop Z folk?  No.  Never.

7     Q.  Did you ever talk to any trooper that

8  participated in interviews of anyone associated with

9  that investigation?

10    A.  No.

11    Q.  Has anyone to this day ever told you about

12 what the findings of that investigation were?

13    A.  No.

14    Q.  Is that important for you to know?

15    A.  No.

16    Q.  Why not?

17    A.  Because I have nothing to do with it.

18    Q.  Okay.  In your role as secretary of public

19 safety, were you the conduit between the governor and

20 DPS?

21    A.  Yes.  A liaison.

22    Q.  Okay.  And would you say that your primary

23 role in that job is to provide good information up

24 and down between the governor's office and the

25 agency?

1  discussions with anybody at all related to the Troy

2  German matter?

3     A.  Late spring, yes, couple different

4  discussions.  We need to establish the dates here.

5     Q.  Okay.  Well, let's back up.  First of all, how

6  many specific discussions do you recall that you know

7  of?

8     A.  It was a very widely-known matter all over the

9  newspapers but specific discussions -- I had one with

10 Megan Simpson on the heels of a meeting that Gary

11 James requested with me and Mark Burget at the time

12 who was general counsel for the governor's office.

13    Q.  Okay.  Put those conversations in time context

14 for me.  Do you know when you had each of those

15 conversations?

16    A.  I don't know the exact dates.  It was in the

17 spring of '19.  The first meeting though was with

18 Gary James --

19    Q.  Okay.  Tell me --

20    A.  -- which resulted in the meeting followup with

21 Megan.

22    Q.  Okay.  Tell me about the meeting with Gary --

23 first of all, who is Gary James?

24    A.  I believe he's the Oklahoma State Troopers

25 Association's legal counsel or -- I don't know his

Chip Keating 10/5/2022                                76

```
 1  title.
 2      Q.  Okay.  How long have you known Gary James?
 3      A.  When did I first meet him?
 4      Q.  Yes.
 5      A.  Probably when I became a trooper in '01.
 6      Q.  And when you became a trooper in '01 and met
 7  Gary James, what was his job or role or duty?
 8      A.  Well, I couldn't even tell you how I met him.
 9  Just in passing his name was kind of known because he
10  was the patrol's attorney if you were going to use
11  force.  I believe he still is today.
12      Q.  So if there's a use-of-force case or shooting
13  or something like that, potentially there could be
14  criminal exposure to the trooper.  Correct?
15      A.  Correct.
16      Q.  And civil exposure to the trooper.  Correct?
17      A.  Correct.
18      Q.  Do you know if Gary James represented people
19  on civil matters, criminal matters or both?
20      A.  I don't know.
21      Q.  And are you familiar with that sort of
22  use-of-force litigation or --
23      A.  No.
24      Q.  -- action?  Okay.  Needless to say, in such
25  actions Gary James would represent the trooper in
```

Chip Keating 10/5/2022                                          84

 1   months?
 2      A.  My schedule -- it could have been a couple
 3   weeks.
 4      Q.  Okay.
 5      A.  Yeah.  I mean it was not six months.
 6      Q.  Wasn't the next day?
 7      A.  No.
 8      Q.  Was it -- do you know if it was the following
 9   week?
10      A.  Within a couple weeks we met.
11      Q.  Where was this meeting at?
12      A.  At my office.
13      Q.  I believe you told us that it was yourself,
14   Gary James and Mr. Burget?
15      A.  Correct.
16      Q.  Anyone else?
17      A.  No.
18      Q.  What happened at that meeting?
19      A.  Golly, he met in there for several hours.  It
20   wouldn't end.  The guy got all emotional, started
21   crying.  I mean it was just a lot.
22      Q.  Gary James got emotional and was crying?
23      A.  Yeah.
24      Q.  Did you think that was odd?
25      A.  Maybe he's a sensitive guy.  I guess so.

 1    Q.  What was he emotional and crying over?

 2    A.  I don't recall what but I just thought, Why is

 3  he getting so emotional about all these things.

 4    Q.  What was the information that he provided

 5  during the meeting?

 6    A.  Basic high level, really no -- down in the

 7  weeds -- that essentially that Mr. German was

 8  being -- some unduly targeted and some other guys

 9  were on leave unjustly because they were whistle

10  blowing on Troy German and I mean that was the

11  context of it.  High level.  But I don't remember all

12  the detail in it.

13    Q.  Who were the guys that were on leave for

14  whistle blowing on Troy German?

15    A.  Tim Tipton and Jack McCoy.

16    Q.  And Gary James told you he believed that those

17  two were being retaliated against?

18    A.  Correct.

19    Q.  What were the actions that Tim Tipton and Jack

20  McCoy had supposedly done that were drawing

21  retaliation from people at DPS?

22    A.  He didn't share them with me.

23    Q.  Why not?

24        MR. SHINN:  Object to the form.

25        THE WITNESS:  I dont' know.

Chip Keating 10/5/2022                                    87

 1  privilege issues here so --

 2      MR. HOPSON:  Well, I'm not asking about

 3  communications.  I'm asking what was the information

 4  that he asked you to look into.

 5      MR. SHINN:  Right.  If he's trying to render

 6  legal advice and he's asking for information -- to

 7  gather information so that he can render legal

 8  advice, I mean we would be a little careful.  I just

 9  want to make sure you don't disclose any

10  attorney-client privilege communications that you're

11  aware of.

12      Q.  (By Mr. Hopson)  Well, let me ask it this way.

13  What information from Gary James was provided during

14  the meeting that you were asked to look into?

15      A.  To have a conversation again with Rusty about

16  this meeting which I did.

17      Q.  Would it have interested you at the time to

18  know that Gary James had paid Tim Tipton to be an

19  expert witness on behalf of his clients?

20      A.  No.

21      Q.  If Tim Tipton had been implicated in the

22  Troop Z investigation as complicit in efforts to hide

23  information from Troy German, would that have

24  interested you at the time of that meeting?

25      A.  Look, I'll listen to whomever.  I'm an

1  governor's dissatisfied and, you know, there needs to

2  be changes, like, big time quickly.

3      Q.  What was the governor dissatisfied about?

4      A.  I think the -- I can't speak for the governor,

5  but I think the governor -- I want to be very clear.

6  I went out on a limb and was Rusty's biggest

7  champion.  Frankly probably the sole reason he was

8  reappointed to being the commissioner was because of

9  me.

10         And the governor, probably end of April or

11 May, he's in accountability, efficiency.  He wanted

12 to see sweeping changes within the agency, and the

13 governor had told me on a number of occasions he had

14 questions whether Rusty was going to be able to

15 execute on those and said he's a nice guy and a

16 likable guy but not sure he can get this where I want

17 it to go.

18     Q.  Okay.  Did you ever communicate that to Rusty

19 before this one-off meeting?

20     A.  Yeah.  We were in several meetings and a lot

21 of through governor security and a number of things

22 and again I'm trying to be the cheerleader and help.

23     Q.  Okay.  Rusty was appointed and confirmed in

24 what month?

25     A.  Well, I think he was appointed in January and

1  by Troop Z of the highway patrol at that time?

2     A.  Don't know.

3     Q.  So my point is it's very plausible that Gary

4  James had a motive in coming to meet with you on

5  behalf of his friend, Tim Tipton.  Right?

6     A.  You'd have to ask Gary James that.

7     Q.  Or Tim Tipton?

8     A.  Or Tim Tipton.

9     Q.  Who was under investigation.  Right?

10    A.  So I was told.  And Jack McCoy.

11    Q.  If somebody on behalf of Tim Tipton and Jack

12 McCoy wanted to interfere or end an investigation but

13 couldn't do so through the proper procedures of going

14 through the chain of command at the Oklahoma Highway

15 Patrol, is it fair to say that one way they could do

16 that is by going around that chain of command and

17 going to you and request a meeting?

18    A.  Yeah.  But it didn't end the investigation.

19    Q.  It didn't?

20    A.  No.

21    Q.  Okay.  How long did the investigation go on

22 after that meeting with Gary James?

23    A.  You'd have to ask John Scully and Chief Sugg.

24    Q.  Okay.  Because John Scully and Chief Sugg were

25 the ones that concluded that investigation.  Right?

1    A.  That's my understanding.

2    Q.  After they replaced the plaintiffs as head of

3 DPS and the highway patrol?

4    A.  Sometime thereafter.  Correct.

5    Q.  Okay.  Because the head of DPS and highway

6 patrol, specifically Rusty Rhoades and his

7 administration, would not conclude those

8 investigations for Gary James.  Correct?

9    A.  They weren't asked to.

10    Q.  Why not?

11    A.  You'd have to ask Gary James.  No one asked

12 them to conclude investigations.

13    Q.  And so it wasn't until he put this issue in

14 front of you that that began to gain scrutiny at any

15 time.  Correct?

16        MR. SHINN:  Object to the form.

17        THE WITNESS:  No.  The scrutiny was gained

18 after Rusty and I had our meeting in August.  And I

19 called the general and then subsequently after the

20 criminal charges were dismissed in June or whatever

21 the date was -- June 28th -- my only thing with

22 Rusty -- he didn't know why it was dismissed.

23        We talked about it -- was to get a release and

24 then subsequently my radars went way up when I got

25 forwarded a civil lawsuit from Troy German to the

 1    A.  Not the day what happened?

 2    Q.  Not the day that the separation from

 3  employment happened?

 4    A.  Well, my point is -- when was the decision

 5  made?  The decision was made the day it happened.

 6  Like, that's when it happened.  It speaks for itself.

 7    Q.  Well, my question, which you just answered and

 8  told me was late August -- my question was when was

 9  the moment that Governor Stitt decided to separate

10  Rusty Rhoades, Megan Simpson, Mike Harrell from their

11  employment with the agency?

12        MR. SHINN:  Object to the form.  You can

13  answer if you know.

14        THE WITNESS:  I don't know.

15    Q.  (By Mr. Hopson)  Who would know that?

16    A.  I don't know.

17        MR. SHINN:  Object to the form.  Asked and

18  answered.

19    Q.  (By Mr. Hopson)  Governor Stitt would know

20  that.  Correct?

21    A.  I don't know.

22    Q.  You don't know if the governor even would know

23  when the governor made the decision?

24    A.  I don't know when the date of the meeting that

25  Junk and Donelle and John Budd sat down with the

Chip Keating 10/5/2022                                    169

1  governor.  I have no idea.

2      Q.  I didn't ask about the date that --

3      A.  Okay.  But that would be likely the day that

4  the decision was made to --

5      Q.  Likely?  Likely, right?

6      A.  Likely because I don't know.

7      Q.  That's my point.  You don't know when the

8  governor made the decision to terminate?

9      A.  Fair.

10     Q.  Okay.  So going back on our list of events we

11 had the phone call with Budd, Junk and Harder and

12 then you believe at some point there was a meeting

13 with Budd, Junk and Harder and the governor?

14     A.  I don't know of all of them in there but,

15 yeah.

16     Q.  And do you know -- you weren't there for that

17 meeting?

18     A.  No.

19     Q.  What was your next involvement following that

20 meeting?

21     A.  One of the three of them would have reached

22 out, likely John Budd, because at the time I think he

23 had OMES under his purview.  I think he was actually

24 head of that agency as well as chief operating

25 officer, but I'm not 100-percent certain on that.

Chip Keating 10/5/2022                                      171

1  you meany by he's the governor.

2      A.  That's not what I said.  I didn't say that.

3      Q.  Well, isn't it true as you told us before that

4  the statutes of Oklahoma say that the governor is the

5  person with the authority to hire or terminate the

6  commissioner of DPS, not the deputy secretary of

7  public safety.  Right?

8      A.  It is true that the governor delegated his

9  authority formally to the deputy secretary to follow

10  through with his orders.

11     Q.  Okay.  Okay.  So you don't know why the

12  governor didn't do it himself?

13     A.  I don't know why.

14     Q.  Let me show you what is marked as Exhibit 39.

15  We have already done exhibits in this case.  We're

16  just carrying on the numbering.  That's 39.  I'd like

17  you to take a look at that and let me know if you

18  recognize that document.  Do you recognize that

19  document?

20     A.  I do.

21     Q.  What is that document?

22     A.  These are my interrogatory responses.

23     Q.  These are your answers to discovery to

24  plaintiff, Rusty Rhoades.  Correct?

25     A.  Correct.