IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

(1) BILLY D. "RUSTY" RHOADES III,  )
an individual,                     )
(2) MEGAN L. SIMPSON, an           )
individual;                        )
and                                )
(3) MICHAEL S. HARRELL, an         )
individual,,                       )
                                   )
    Plaintiffs,                    )
                                   )
VS.                                ) Case Number
                                   ) CIV-20-761-R
(1) THE STATE OF OKLAHOMA, ex rel. )
GOVERNOR KEVIN STITT;              )
(2) THE STATE OF OKLAHOMA, ex rel. )
THE DEPARTMENT OF PUBLIC SAFETY;   )
(3) KEVIN STITT , an individual;   )
(4) CHIP KEATING, an individual;   )
(5) JASON NELSON, an individual;   )
(6) JOE CLARO, an individual,      )
                                   )
    Defendants.                    )

\* \* \* \* \*

DEPOSITION OF MEGAN L. SIMPSON
TAKEN ON BEHALF OF THE DEFENDANTS
IN OKLAHOMA CITY, OKLAHOMA
ON MARCH 29, 2022
COMMENCING AT 9:05 A.M.

\* \* \* \* \*

INSTASCRIPT, L.L.C.
125 PARK AVENUE, SUITE LL
OKLAHOMA CITY, OKLAHOMA 73102
405.605.6880
schedule@instascript.net

REPORTED BY:   CHERYL D. RYLANT, CSR, RPR

**EXHIBIT 5**

1  the time because contextually there was no reason for
2  me to do so.
3       So this is the week -- this is the week before
4  labor -- this is Labor Day weekend; so this is the
5  Wednesday before Labor Day weekend and I went out of
6  town for Labor Day weekend on Friday.  So I don't
7  recall whether or not Mr. Claro came on Saturday and
8  got his belong- -- I don't -- I don't remember how
9  that happened.
10      But subsequent, on Friday afternoon as I was
11 driving to Arkansas, I got a phone call from
12 Matt Thompson who was the vice president with IDEMIA.
13 And IDEMIA was the vendor that was in charge of the
14 Real ID/modernization project.  So there were two
15 projects going on at once.  I called them the
16 Siamese twin projects.  There was the modernization
17 of the entire DPS legacy computer system.  So we had
18 a legacy computer system that only two people knew
19 how to go into the code and those people were no
20 longer around.  I mean, it was -- you know, if you're
21 familiar with legacy systems, they're constructed
22 just out of whole cloth.  It's like sitting down with
23 basic and creating a computer system.
24      So we had to completely modernize the computer
25 system first to support Real ID, but they were

1   totally separate projects because the computer system
2   at DPS does a lot of things other than Real ID.  So
3   those projects were both going on simultaneously both
4   spearheaded by IDEMIA.
5           Matt Thompson was the person that was kind of
6   the point of contact for Real ID.  He called me on my
7   way to -- on vacation as I was driving and said,
8   "What is going on?"
9           And I said, "I'm driving."
10          He said, "No.  I mean, I just got a call from
11  Chip Keating screaming at me about" -- I'll use his
12  language -- "what the fuck is going on" or "it's all
13  fucking wrong" or "it's fucked up" or something with
14  the F word in it.  And he said, "I can't figure out
15  what he's talking about."  He says, "You know,
16  everything is -- we're not meeting benchmarks."  And
17  Matt said to me, "We are meeting benchmarks; so I
18  don't understand what he's talking about."
19          And I said, "I have no idea what he's talking
20  about.  As far as I'm concerned, I'm on the same page
21  as you are; we're meeting all the benchmarks."
22          And he said, "Yeah.  He was really upset."
23          And I said, "Okay.  "Well."
24          And he said, "I tried to tell him that OMES had
25  separate benchmarks from" --

1   him, "We're on the benchmarks, we're hitting the
2   benchmarks to hit that compliance date.  We're on
3   track.  There isn't an issue with that, but we can't
4   go any faster than that compliance date."  Like
5   everything is -- you know, obviously, it's just like
6   a trial schedule; you back everything up from the
7   trial date.  We back it up from the implementation
8   date.  So here are the times we have to hit to hit
9   that date.  I mean, if I ever got prepared for a
10  trial five days before the trial, it would be
11  shocking.  You don't do that.
12         So, we had an implementation schedule that was
13  on track.  It was not ahead.  And that's what he was
14  asking for.
15         If I recall, Mr. Ostrow came in at least
16  halfway, if not three quarters of the way, through
17  the meeting.  He didn't say much, if anything.  He
18  called me after the meeting on my cell phone.  We
19  left.  I don't know where he went, but he called me
20  and said, "Like he wants -- like this is going to
21  happen, you have to go faster."
22         And I said, "David, we can't go faster."  I had
23  a good working relationship with David Ostrow.  We
24  talked about -- we were also implementing Mobile ID
25  at the time, or at least beta'ing Mobile ID, which

1        Q. And before we get to that meeting, I take it

2   it's a subsequent meeting?

3        A. It is.

4        Q. And just to back up.  So, did Governor Stitt

5   state a reason why he wanted the Real ID

6   implementation to go faster?

7        A. No.

8        Q. Did you have any understanding as to the

9   reason?

10       A. I have an understanding of Governor Stitt

11  from working with him on other items since he took

12  office.  And my understanding is that he wanted a W,

13  he wants things to go faster, he wants to --

14  I believe his term was "always move the needle."  He

15  wanted to move the needle.

16       Q. And did you feel like his expectations about

17  the timing of the rollout were unreasonable?

18       A. Very.  I felt like he lacked an understanding

19  of what the process required.  I did not think that

20  he was open to listening to the explanation of that.

21  He wanted it done, he wanted it done the way he

22  wanted it done, and he didn't want any -- I say

23  excuses, I would say reasons.  But he didn't want any

24  excuses.  He didn't -- I walked away from the meeting

25  feeling like he wasn't understanding the vastness of

1   involving Mr. Tipton and Mr. McCoy and Mr. German;
2   correct?
3       A. Correct.
4       Q. What's a KPI?  Sorry.
5       A. Oh, it's a measurement of success.  It's a --
6   some business term that I can't remember.
7           MR. SHINN:  Key performance indicator.
8           THE WITNESS:  Thank you.  It's a key
9   performance indicator --
10      Q. (By Mr. Duncan)  Thank you.
11      A. -- thanks to your co-counsel.  I can't ever
12  remember.
13      Q. When you had the conversation that you had
14  with Mr. Keating, the phone call --
15      A. Yes.
16      Q. -- that followed the day after he had
17  requested that you come to his office; right?
18      A. Yes.
19      Q. During that phone call, did Mr. Keating
20  express some concern about the fact that Mr. Tipton
21  and Mr. McCoy had been placed on administrative
22  leave?
23      A. Yes.
24      Q. And what was his concern?  What did he say?
25      A. "Why has it been so long?"  "What did they

1  do?"  "You know, why hasn't -- why hasn't this moved

2  forward?"  "And what were the allegations that were

3  causing them to be placed on administrative leave so

4  long?"  As I recall, in a nutshell.

5       Q. And you answered his questions and I think

6  you covered that in your prior answer.

7         What was his -- I guess, how did you leave that

8  conversation?

9       A. At that point, I -- at that point, I think he

10 just said, "Thanks for the information."

11      Q. Okay.

12      A. I honestly don't remember exactly how it

13 ended, but there was no directive at that point about

14 anything.

15      Q. And there never was a directive provided to

16 you from Mr. Keating; correct?

17      A. Yes, there was.  In the email that he sent in

18 August, it was directed also to me.

19      Q. And besides that email, there's no other

20 directive though -- correct? -- from Mr. Keating?

21      A. Not directly, no.

22      Q. How about indirectly?

23      A. Regarding the Troop Z investigation or

24 regarding the other things we've discussed?

25      Q. I'm sorry.  The Troop Z investigation.

1  correct?

2  A. I did.

3  Q. And so you briefed him on that investigation

4  at that time; correct?

5  A. I felt like I did.

6  Q. And so, here when Mr. Keating is asking on

7  August 17th of 2019 to be fully briefed, wouldn't you

8  agree he's only asking to be provided information --

9  the type of information that you had already

10  previously provided to him?

11  A. I do not agree.

12  Q. Why not?

13  A. Because the previous investigation was a

14  criminal investigation by Troop Z.  The matters that

15  were pending on August 17th were internal personnel

16  matters that were administrative in nature and they

17  included information that would not have been

18  contained in the conversation I had with Mr. Keating.

19      Captain Tipton and Major McCoy had

20  administrative infractions that had nothing to do

21  with the blackmail that were uncovered as part of the

22  Troop Z investigation.  So he would not be privy to

23  that information because he is -- because those are

24  administrative.  And as I -- as I told Rusty at the

25  time, to allow somebody outside of the agency to know

1    what those allegations were, what if they were not

2    substantiated?  Then, at that point, they're out

3    there, which is not fair to the employee.

4         So, he -- I couldn't brief him on the

5    administrative infractions.  I briefed him on the

6    criminal action and the allegations that were

7    criminal in nature of which there were some and there

8    were administrative infractions.  What we

9    discussed -- his questions were about, "Why are they

10   on administrative leave as it relates to

11   Troy German?"  I think that the phrasing of this

12   email makes it very clear that he does not know that

13   there are other administrative concerns that do not

14   connect to the Troy German matter that are included

15   in that investigation.  So, that's why I couldn't

16   discuss them, because they weren't criminal; they

17   were administrative and, therefore, confidential, to

18   protect the employee as much as anything.

19        Q. I guess I'm confused because I thought -- in

20   the phone conversation that you had had with

21   Mr. Keating before this email, I thought you had

22   explained to him, in response to his questions, the

23   reasons why Mr. McCoy and Mr. Tipton were placed on

24   administrative leave.  Is that not correct?

25        A. As they related to Troy German, yes.  But

1  I believe my response to him was, "This is what they
2  had to do with the blackmail.  This is how I think
3  they're co-conspirators or at least accessories," and
4  other administrative matters.
5       Q. Which you did not elaborate on?
6       A. That is correct.
7       Q. Because you felt it would be improper?
8       A. Correct.
9       Q. What's the basis for that?  Why would it have
10 been improper to brief Mr. Keating on administrative
11 personnel matters within the agency?
12      A. As I just explained, I'm still investigating
13 and we're still making decisions about how we handle
14 internal administrative matters.  The highway patrol
15 or DPS is no different than any other workplace.  If,
16 hypothetically, you accuse me of stealing, I don't
17 know, somebody's password and using it to log in and
18 write their brief and take credit for their work and
19 bill their hours.  Okay?  That's probably an
20 administrative matter.  It's probably not going to
21 go -- it's not going to be criminal.
22      And then you go and find out, no, it wasn't
23 Megan, it was, you know, Marsha, you know.  If that
24 information got out of the firm before you finished
25 the investigation and found those allegations not to

1   does, because the Governor's, you know, cousin is
2   married to him, does the Governor get to call up and
3   ask me about that personnel matter?  I don't think
4   so.
5           So I don't know if there's some exception for
6   the Governor to know about this or not.  So I would
7   have looked at that and probably offered a
8   middle ground like, "I would like to meet with
9   general counsel for the Governor's office and I'll
10  share with him or her, you know, the nature of the
11  allegations," because that would be a confidential
12  protected communication.  I'm not saying I would have
13  done that.  I'm just saying that's a middle ground
14  that I might have considered.  There may be an
15  exception.  I -- I don't know.  But I wasn't
16  confronted with that question.  I was confronted with
17  this question.
18          Q.  Okay.  You mentioned, in your opinion, a
19  cabinet secretary lacks the authority to ask for this
20  type of information.  Can you refer me to --
21          A.  Keating versus Edmondson.
22          Q.  Okay.  King or --
23          A.  Keating.
24          Q.  Keating?
25          A.  That would be Mr. Keating's father.

1      Q. Father.

2      A. And it's actually over -- it's not just this
3  authority.  It just -- it started as an AG's opinion
4  and became a case and indicates that cabinet
5  secretaries are advisory in nature and lack
6  authority.

7      Q. All right.  I think we're done with that
8  document.

9      A. Oh, lay that aside?

10     Q. Yeah, you can, for sure.

11     A. Okay.

12     Q. So, in terms of what happened --

13     A. You're going to need to be a little more
14  specific.  What happened?

15     Q. Let me finish.

16        So, I'm trying to figure out what is the action
17  that Mr. Keating took or allegedly took that you
18  consider to be tortious interference?  A lot of this
19  information you provided is really good background,
20  I think.  I don't want to characterize your
21  testimony.  But I want to know what the actions were
22  that he took to tortiously interfere, the
23  interference part.  Does that make sense?

24     A. Yes.

25     Q. Okay.

1  presented to you, was get more information, get to
2  the bottom of it, talk to you, talk to Mr. Rhoades,
3  talk to Mr. Harrell.  Is that a fair statement of
4  your position?  I'm just trying to understand your
5  position of what he should have done.
6       A. I really don't think we would be the
7  appropriate people to talk to.  I would ask questions
8  of Jason Holt, for instance, who was the head of
9  Troop Z.  You know, if you want objective information
10 and not to rely on some -- you know, somebody else's
11 spinning of the facts if you will, you know, Troop Z
12 was headed up by Captain Jason Holt.  He spearheaded
13 the investigative side of that.  If you are concerned
14 that the individuals that you're asking questions of
15 are not giving you accurate information or have their
16 own personal agenda that they're trying to protect,
17 then there are other sources for that information
18 that are objective, including the investigative arm
19 of the attorney general's office.
20      So, yes, I think it's good to talk to any of
21 the individuals involved, but, for me, objective
22 evidence is always better than subjective evidence.
23      Q. Okay.  Real ID.  So, I believe in your
24 discovery responses you indicated that the benchmarks
25 for Real ID were being realized or met through 2018

1   and 2019.  Is that fair?

2         A. Probably.  I think that's a collective

3   response.  I was not involved with Real ID --

4         Q. Okay.

5         A. -- until May of 2019; so I can only answer

6   from that point forward.

7         Q. Okay.  Just clarifying.

8            In terms of Mr. Tipton and Mr. McCoy, what is

9   the -- what was the wrongdoing that they were

10  implicated in as it relates to Troy German or any of

11  this case?

12        A. Well, as far as I was able to get -- and I

13  won't be able to quote you all of the policy

14  violations, although I certainly have them somewhere

15  written down.

16           Captain Tipton was engaged directly with

17  Troy German before, during, and after the blackmail

18  of Rusty Rhoades.  There are text messages and other

19  objective information that shows that Troy German

20  shared with Tim Tipton what he was doing -- what he

21  was planning on doing, what he was doing.  He was in

22  an advisory capacity to Troy German about how to

23  execute the blackmail, when to give Rusty the note,

24  what to demand, what to ask for, whether or not Rusty

25  should keep the -- they allow him to keep this

1      Tim Tipton, prior to this entire situation,
2  engaged in, I'll call it, an insurance fraud
3  situation in which Troy German had struck his son's
4  vehicle with his patrol vehicle.  Tim Tipton provided
5  his login information to allow Troy German to log in
6  as Tim Tipton and give himself -- investigate his own
7  accident, give himself his own discipline.  That is a
8  high-level infraction.  And really at any
9  workplace -- there's a technology rider on every
10 computer at DPS that you have to be you, don't give
11 your credentials to anybody else, that type of thing.
12      So, that accident occurred I want to say in
13 late May of 2018.  And the evidence shows that
14 Tim Tipton was actively engaged with Troy Tipton --
15 with Troy German during the time he gave him his
16 login and he asked him -- Troy German was instructing
17 Tim Tipton on what document he needed from Tim Tipton
18 to act as Tim Tipton and put that information into
19 the DPS system.  And, of course, risk management pays
20 for repair of patrol vehicles and private vehicles if
21 a patrol vehicle is involved.  So, the patrol vehicle
22 and the personal vehicle of Troy German were both
23 repaired on the State of Oklahoma's dime which,
24 you know, is concerning about Tim Tipton making those
25 decisions.

1        There was another matter that I'm trying to
2    recall.  Those were two concerning situations.  I
3    don't really recall, off the top of my head, what the
4    other -- if and what the other policy violations
5    were.  I can't list them off.  But those were the two
6    big ones.  One that I felt like was to the level of
7    criminal conspiracy and accessory behavior, the other
8    a high-level administrative infraction.  But even --
9    in the patrol, even if somebody is not charged with a
10   crime, if they engage in criminal behavior, it's also
11   an administrative infraction, whether or not they're
12   charged.
13        Q. And so, what was the status of the
14   investigation within DPS into Mr. McCoy and
15   Mr. Tipton at the time that you were terminated?
16        A. I was writing their letters of reprimand.
17   So, if you've ever seen anything from -- have you
18   ever seen anything from OHP that -- it's a very
19   specific form.  There's a format.  So, classified law
20   enforcement -- and maybe we don't have this now.  We
21   don't have merit protection.  But there's a
22   classified law enforcement category at DPS, there's a
23   classified non-law-enforcement, and there's at-will
24   employees.
25        The classified law enforcement, there's a very

1    number 2 in your discovery responses, you say:

2           "The Defendants' assertion that

3       failure to bring the State of Oklahoma into

4       compliance with the Real ID Act is a fiction

5       to cover up and/or hide actual improper and

6       unlawful reasons Defendants acted to

7       decapitate the Oklahoma Department of Public

8       Safety in order to further hide corrupt and

9       unlawful activities within the Oklahoma

10      Highway Patrol."

11      Besides what we've already talked about, any

12   other basis to support that allegation?

13     A. Not that I can recall off the top of my head.

14   We've talked about a lot.  So...

15     Q. In paragraph 100 on the Amended Complaint, it

16   states:

17           "The next day, August 30, 2019, for

18       the first time Defendant Keating accused

19       Plaintiffs and DPS of not meeting benchmarks

20       for Real ID."

21      Was August 30th of 2019 the first time that

22   Defendant Keating did that?

23     A. As far as I was aware.

24     Q. So, prior to that date, Mr. Keating had never

25   expressed any concerns about Real ID to you?

1      A. About meeting the benchmarks?  No.

2      Q. Did he ever express -- that's not my

3  question.

4         Did he ever express any concerns about the

5  implementation of Real ID to you?

6      A. No.

7      Q. Are you aware of him expressing concerns to

8  anyone else?

9      A. I believe discussions occurred with

10 Rusty Rhoades.

11     Q. And when were these conversations?

12     A. You'd have to ask him.  I don't know.  I

13 wasn't -- I wasn't a participant in those

14 conversations.

15     Q. But prior to August 30th, 2019; correct?

16            MR. HOPSON:  Object to the form.

17            THE WITNESS:  I can't tell you that.  I

18 don't know.

19     Q. (By Mr. Duncan)  In paragraph 113 of the

20 Amended Complaint, it states:

21             "Defendants Nelson and Keating

22         interfered with the employment of Plaintiffs

23         by making and/or advancing false and

24         misleading reports to Defendant Stitt

25         following the termination of Defendant Claro

1    A. They had fully investigated both criminal and
2    administrative matters as part of the initial
3    investigation, and they were -- they were no longer
4    involved.  They had closed out that investigation at
5    that point.  And, like I said, I hadn't wrapped back
6    around to them to discuss further steps or whether
7    OPS was going to become involved.
8    Q. Now, there was some ongoing involvement of
9    Troop Z as of the date of this email that's marked as
10   Exhibit 1, August 17 of 2019; correct?
11   A. Not as far as I know.
12   Q. But Jason Holt, was he in charge of that
13   investigation that you told us about previously?
14   A. Correct.  The Troop Z investigation was -- he
15   was the captain in charge, yes.
16   Q. And amidst all of these events of 2019
17   associated with the German investigation and the
18   ongoing administrative matters involving Tipton and
19   McCoy, you, as part of the head of DPS, were involved
20   in trying to meet the Real ID benchmarks; correct?
21   A. Yes.
22   Q. Those things were all going on at the same
23   time?
24   A. They were, yes.
25   Q. And it's your testimony that at all times you

1  were meeting those Real ID benchmarks as set in

2  association with the State of Oklahoma's own team and

3  hired contracts through IDEMIA to get Real ID in

4  place?

5      A. It was my understanding that we were -- we

6  were in compliance with where we needed to be.

7      Q. And that was never not your understanding

8  until the date of your termination.

9         Is that your testimony?

10     A. The first time that I learned that there were

11 concerns regarding meeting benchmarks with Real ID

12 was at the time of the conversations on Friday,

13 August the 30th, with Matt Thompson and Mike Harrell

14 relating the concerns that had been expressed to them

15 by Chip Keating.

16     Q. Friday, August 30th.  And you were terminated

17 what day?

18     A. Monday, September 2nd.

19     Q. Which was Labor Day?

20     A. It was.

21     Q. And that was a national holiday in which

22 there's not a lot of standard news coverage; correct?

23     A. Correct.

24     Q. And the three of you were all terminated at

25 the same time?